# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

RICHARD CORMAN, on his own behalf
and on behalf of all others similarly situated,

      Plaintiff,

vs.                                          No. CIV 15-0913 JB\SMV

JWS OF NEW MEXICO, INC., and
K.P. KAUFFMAN COMPANY, INC.,

      Defendants.

## <u>MEMORANDUM OPINION</u>[1]

**THIS MATTER** comes before the Court on: (i) Defendants JWS's and KPK's Motion for Partial Summary Judgment, filed June 17, 2016 (Doc. 39)("MSJ"); and (ii) the Plaintiff's Cross Motion for Partial Summary Judgment on Defendants' Exemption Defense, filed June 17, 2016 (Doc. 41)("Cross MSJ"). The Court held a hearing on July 20, 2016. The primary issues are: (i) whether Defendants JWS of New Mexico, Inc. and K.P. Kauffman Company, Inc. (collectively, "the Defendants") are entitled to summary judgment on the Second Claim of the Collective Action Complaint for Unpaid Overtime Wages, filed October 12, 2015 (Doc. 1)("Complaint"), which alleges that the Defendants failed to pay Plaintiff Richard Corman and the proposed class members, all former JWS New Mexico truck drivers, overtime wages in violation of the New

---

[1]This Memorandum Opinion follows the Court's Order, filed on March 13, 2017 (Doc. 64), disposing of: (i) Defendants JWS's and KPK's Motion for Partial Summary Judgment, filed June 17, 2016 (Doc. 39); and (ii) the Plaintiff's Cross Motion for Partial Summary Judgment on Defendants' Exemption Defense, filed June 17, 2016 (Doc. 41). In the Order, the Court indicated that it would, at a later date, issue a Memorandum Opinion more fully detailing its rationale for this decision. This Memorandum Opinion is the promised opinion.

Mexico Minimum Wage Act, N.M. Stat. Ann. § 50-4-22(D) ("NMMWA"), on the grounds that Corman and the Class ("the Plaintiffs") were exempt from the NMMWA's overtime pay requirements under NMMWA § 50-4-21(C)(5); and (ii) whether, alternatively, the Plaintiffs are entitled to summary judgment on JWS New Mexico's and Kauffman Co.'s asserted exemption defense, because the Defendants are liable for unpaid overtime wages. After carefully reviewing the record, the Court concludes that because JWS New Mexico compensated the Plaintiffs on a commission basis, NMMWA § 50-4-21(C)(5) overtime pay requirements do not apply to the Plaintiffs. The Court concludes that JWS New Mexico and Kauffman Co. are entitled to summary judgment on the Complaint, and the Plaintiffs are not entitled to summary judgment on the Defendants' exemption defense. The Court grants the MSJ and denies the Cross MSJ.

## FACTUAL BACKGROUND[2]

The Court draws the factual background from the parties' undisputed material facts in the MSJ; Plaintiff's Memorandum in Support of His Cross Motion for Partial Summary Judgment on Defendants' Exemption Defense, filed June 17, 2016 (Doc. 41-1)("Cross Memo."); and Defendants JWS' and KPK's Response to Plaintiff's Cross Motion for Partial Summary Judgment, filed July 1, 2016 (Doc. 46)("Cross MSJ Response").

JWS New Mexico offers oilfield services to oil production companies in southeast New Mexico. See Cross Memo. ¶ 1, at 4 (asserting this fact)(citing Complaint ¶ 12, at 3); Answer ¶ 12,

---

[2]JWS New Mexico, Kauffmann Co., and the Plaintiffs agreed that the Court could, for the MSJ and Cross MSJ, issue a single opinion with a Factual Background section that dealt jointly with the undisputed facts from the MSJ and Cross Motion for Partial Summary Judgment on Defendants' Exemption Defense, filed June 17, 2016 (Doc. 41-1). See Draft Transcript of Hearing at 4:11-5:11 (taken July 20, 2016)(Court)("Tr.") at 7:16-18 (Johnson); id. at 34:24-35:3 (Milstein). This Factual Background section includes facts from both summary judgment motions.

at 3, filed December 18, 2015 (Doc. 23)).[3]  JWS New Mexico is a wholly-owned subsidiary of Kauffmann Co.  See Cross Memo. ¶ 2, at 4 (asserting this fact)(citing Complaint ¶ 11, at 2; Answer ¶ 11, at 3).[4]

Corman and the other Plaintiffs drove trucks for JWS New Mexico; Corman drove for JWS New Mexico from July 20, 2011, to April 6, 2015.  See Cross Memo. ¶ 3, at 4 (asserting this fact)(citing Deposition of Richard Corman at 7:23-8:7 (taken May 3, 2016), filed June 17, 2016 (Doc. 41-2)("Corman Depo.").  The Plaintiffs hauled water products to oil drilling rigs and removed waste products, such as mud, from the rigs.  See MSJ ¶ 1, at 2 (asserting this fact)(citing Deposition of Dimas Herrera at at 8:10-22 (taken May 5, 2016), filed June 17, 2016 (Doc. 42)("Herrera Depo."); Corman Depo. at 8:23-9:8).[5]  The Plaintiffs often worked more than forty hours per workweek, see Cross Memo. ¶ 4, at 4 (asserting this fact)(citing Corman Depo. at 18:14-17),[6] but they largely worked six days in a row, followed by two days off, see MSJ ¶ 2, at 2

---

[3]JWS New Mexico and Kauffmann Co. do not respond to this alleged, undisputed fact. See Cross Response at 1.  The Court therefore deems this fact undisputed.  See D.N.M. LR Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[4]JWS New Mexico and Kauffmann Co. do not respond to this alleged, undisputed fact. See Cross Response at 1.  The Court therefore deems this fact undisputed.  See D.N.M. LR Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[5]The Plaintiffs do not respond to the alleged, undisputed facts in the MSJ.  See MSJ Response.  The Court therefore deems this fact undisputed.  See D.N.M. LR Civ. 56.1(b) ("All material facts set forth in the [summary judgment motion] will be deemed undisputed unless specifically controverted.").

[6]JWS New Mexico and Kauffmann Co. do not respond to this alleged, undisputed fact. See Cross Response at 1.  The Court therefore deems this fact undisputed.  See D.N.M. LR Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

(asserting this fact)(citing Corman Depo. at 9:14-23; Deposition of Renee De La Torre at 22:23-25 (taken May 4, 2016), filed June 17, 2016 (Doc. 39-3)("De La Torre Depo.")).[7]

During a six-day shift, the Plaintiffs did not work consistent hours; Corman worked "two days to three days straight," went home, returned, and repeated the work.  MSJ ¶ 3, at 3 (asserting this fact)(quoting Corman Depo. at 10:6-11).[8]  The Plaintiffs did not drive consistently through the several days, as JWS New Mexico followed Department of Transportation ("DOT") regulations restricting driving time and requiring rest periods.  See MSJ ¶ 3 n.3 (asserting this fact)(citing Corman Depo. at 12:10-13:18; id. at 19:23-25; id. at 53:24-55:8; id. at 58:15-18; JWS Policies re Driver's Logs, filed June 17, 2016 (Doc. 40-2); Daily Logs, filed June 17, 2016 (Doc. 40-1)).[9]  Renee De La Torre, a JSW New Mexico truck driver, worked twenty four hours, but would "sometimes stay 30."  MSJ ¶ 4, at 3 (asserting this fact)(quoting De La Torre Depo. at 23:1-6).[10]  Leopoldo Garcia, a JSW New Mexico truck driver, would "start [working] on a Monday in the

---

[7]The Plaintiffs do not respond to the alleged, undisputed facts in the MSJ.  See MSJ Response at 1-2.  The Court therefore deems this fact undisputed.  See D.N.M. LR Civ. 56.1(b) ("All material facts set forth in the [summary judgment motion] will be deemed undisputed unless specifically controverted.").

[8]The Plaintiffs do not respond to the alleged, undisputed facts in the MSJ.  See MSJ Response at 1-2.  The Court therefore deems this fact undisputed.  See D.N.M. LR Civ. 56.1(b) ("All material facts set forth in the [summary judgment motion] will be deemed undisputed unless specifically controverted.").

[9]The Plaintiffs do not respond to the alleged, undisputed facts in the MSJ.  See MSJ Response at 1-2.  The Court therefore deems this fact undisputed.  See D.N.M. LR Civ. 56.1(b) ("All material facts set forth in the [summary judgment motion] will be deemed undisputed unless specifically controverted.").

[10]The Plaintiffs do not respond to the alleged, undisputed facts in the MSJ.  See MSJ Response at 1-2.  The Court therefore deems this fact undisputed.  See D.N.M. LR Civ. 56.1(b) ("All material facts set forth in the [summary judgment motion] will be deemed undisputed unless specifically controverted.").

morning" and leave "Tuesday at noon." MSJ ¶ 5, at 3 (asserting this fact)(quoting Deposition of Leopoldo Garcia at 27:6-14 (taken May 4, 2016), filed June 17, 2016 (Doc. 39-4)("Garcia Depo.")).[11] Ivan Lizardo, a JSW New Mexico truck driver, would "go in, and it could be 24 hours, or it could be 15, and it would depend if there was a lot of work." MSJ ¶ 6, at 3 (asserting this fact)(quoting Deposition of Ivan Lazardo[12] at 10:13-20 (taken May 3, 2016), filed June 17, 2016 (Doc. 39-5)("Lizardo Depo.")).[13] A "pusher," a supervisor, would assign the Plaintiffs to a new job after they completed a job. MSJ ¶ 7, at 3 (citing Corman Depo. 13:21-14:7; Herrera Depo. 12:7-13:15; De La Torre Depo. 23:16-24:4).[14] The Plaintiffs' hours depended on the type and length of a job. See MSJ ¶ 8, at 3 (asserting this fact)(citing Declaration of Dimas Herrera ¶ 3, at 1 (executed on June 16, 2016), filed June 17, 2016 (Doc. 39-6)("Herrera Decl.")).[15] Drivers might

---

[11]The Plaintiffs do not respond to the alleged, undisputed facts in the MSJ. See MSJ Response at 1-2. The Court therefore deems this fact undisputed. See D.N.M. LR Civ. 56.1(b) ("All material facts set forth in the [summary judgment motion] will be deemed undisputed unless specifically controverted.").

[12]The deposition transcript misspells Lizardo's name "Lazardo." See MSJ at 3 n.4.

[13]The Plaintiffs do not respond to the alleged, undisputed facts in the MSJ. See MSJ Response at 1-2. The Court therefore deems this fact undisputed. See D.N.M. LR Civ. 56.1(b) ("All material facts set forth in the [summary judgment motion] will be deemed undisputed unless specifically controverted.").

[14]The Plaintiffs do not respond to the alleged, undisputed facts in the MSJ. See MSJ Response at 1-2. The Court therefore deems this fact undisputed. See D.N.M. LR Civ. 56.1(b) ("All material facts set forth in the [summary judgment motion] will be deemed undisputed unless specifically controverted.").

[15]The Plaintiffs do not respond to the alleged, undisputed facts in the MSJ. See MSJ Response at 1-2. The Court therefore deems this fact undisputed. See D.N.M. LR Civ. 56.1(b) ("All material facts set forth in the [summary judgment motion] will be deemed undisputed unless specifically controverted.").

work eight-hour days throughout the six-day shift, or they might work twenty-four hours, sleep, then work the next day.  See MSJ ¶ 8, at 3 (asserting this fact)(citing Herrera Decl. ¶ 3, at 1).[16]

Fluctuations in the oil industry also affected the Plaintiffs' work hours, because they would work more when prices and demand for their services were high.  See MSJ ¶ 9, at 3-4 (asserting this fact)(citing Herrera Decl. ¶ 4, at 1-2).[17]  JWS New Mexico's gross monthly revenue varied significantly between months and between years.  See MSJ ¶ 10, at 4 (citing Declaration of Richard Stults ¶ 3, at 1-2 (executed on June 15, 2016), filed June 17, 2016 (Doc. 40-3)("Stults Decl.")).[18] In January, 2015, the gross monthly revenue was $1,560,069.57, and in November, 2015, the gross monthly revenue was $321,410.25 -- a seventy-nine percent difference.  See MSJ ¶ 10, at 4 (asserting this fact)(citing Stults Decl. ¶ 3, at 1-2).[19]  In January, 2014, JWS New Mexico earned $2,103,890.85, a fifty-two percent increase since January, 2013's total of $1,381,754.62, and in November 2014, JWS New Mexico earned $321,410.25, an eighty percent decrease from the

[16]The Plaintiffs do not respond to the alleged, undisputed facts in the MSJ.  See MSJ Response at 1-2.  The Court therefore deems this fact undisputed.  See D.N.M. LR Civ. 56.1(b) ("All material facts set forth in the [summary judgment motion] will be deemed undisputed unless specifically controverted.").

[17]The Plaintiffs do not respond to the alleged, undisputed facts in the MSJ.  See MSJ Response at 1-2.  The Court therefore deems this fact undisputed.  See D.N.M. LR Civ. 56.1(b) ("All material facts set forth in the [summary judgment motion] will be deemed undisputed unless specifically controverted.").

[18]The Plaintiffs do not respond to the alleged, undisputed facts in the MSJ.  See MSJ Response at 1-2.  The Court therefore deems this fact undisputed.  See D.N.M. LR Civ. 56.1(b) ("All material facts set forth in the [summary judgment motion] will be deemed undisputed unless specifically controverted.").

[19]The Plaintiffs do not respond to the alleged, undisputed facts in the MSJ.  See MSJ Response at 1-2.  The Court therefore deems this fact undisputed.  See D.N.M. LR Civ. 56.1(b) ("All material facts set forth in the [summary judgment motion] will be deemed undisputed unless specifically controverted.").

$1,637,774.63 earned in November, 2014.  See MSJ ¶ 10, at 4 (asserting this fact)(citing Stults Decl. ¶ 3, at 1-2).[20]

For each job that the Plaintiffs completed, regardless how JWS New Mexico charged the customer, JWS New Mexico paid the Plaintiffs twenty-five percent of the customer's transportation charge.  See MSJ ¶ 11, at 4 (asserting this fact)(citing Herrera Decl. ¶ 5, at 2; Herrera Depo. at 79:15-25; Corman Depo. at 68:5-8); MSJ ¶ 16, at 5 (asserting this fact)(citing Herrera Decl. ¶ 5, at 2).[21]  JWS New Mexico calculated the customer's charge by an hourly bid rate, a barrel bid rate, or an hourly rate.  See MSJ ¶ 12, at 4 (asserting this fact)(citing Herrera Decl. ¶ 6, at 2; Herrera Depo. at 43:21-45:5).[22]  JWS New Mexico based hourly bid rates on estimates "of how long the job would take," considering the distance, road conditions, and similar concerns.  MSJ ¶ 13, at 4-5 (asserting this fact)(citing Herrera Decl. ¶ 7, at 2; Herrera Depo. at 47:15-49:6).[23]  JWS New Mexico calculated barrel bid rates based on the number of barrels delivered to the

---

[20]The Plaintiffs do not respond to the alleged, undisputed facts in the MSJ.  See MSJ Response at 1-2.  The Court therefore deems this fact undisputed.  See D.N.M. LR Civ. 56.1(b) ("All material facts set forth in the [summary judgment motion] will be deemed undisputed unless specifically controverted.").

[21]The Plaintiffs do not respond to either alleged, undisputed fact in the MSJ.  See MSJ Response at 1-2.  The Court therefore deems this fact undisputed.  See D.N.M. LR Civ. 56.1(b) ("All material facts set forth in the [summary judgment motion] will be deemed undisputed unless specifically controverted.").

[22]The Plaintiffs do not respond to the alleged, undisputed facts in the MSJ.  See MSJ Response at 1-2.  The Court therefore deems this fact undisputed.  See D.N.M. LR Civ. 56.1(b) ("All material facts set forth in the [summary judgment motion] will be deemed undisputed unless specifically controverted.").

[23]The Plaintiffs do not respond to the alleged, undisputed facts in the MSJ.  See MSJ Response at 1-2.  The Court therefore deems this fact undisputed.  See D.N.M. LR Civ. 56.1(b) ("All material facts set forth in the [summary judgment motion] will be deemed undisputed unless specifically controverted.").

customer, multiplied by a price-per-barrel, which it calculated considering the distance between the client and the water station, road conditions, water costs, and similar concerns.  See MSJ ¶ 14, at 5 (asserting this fact)(citing Herrera Decl. ¶ 8, at 2; Herrera Depo. at 45:6-47:14).[24]  JWS New Mexico based hourly rates on the hours a job required, and JWS New Mexico charged water and waste product disposal costs separately when charging an hourly rate.  See MSJ ¶ 15, at 5 (citing Herrera Decl. ¶ 9, at 2; Herrera Depo. at 49:13-18).[25]  Where JWS New Mexico charged a customer an hourly rate, the driver makes an amount calculated based on the hours for the job.  See Cross Memo. ¶ 11, at 5.[26]  For jobs on a bid basis, the driver receives a set amount regardless the job's duration.  See Cross Memo. ¶ 12, at 5 (asserting this fact)(citing Herrera Depo. at 80:15-20).[27]

---

[24]The Plaintiffs do not respond to the alleged, undisputed facts in the MSJ.  See MSJ Response at 1-2.  The Court therefore deems this fact undisputed.  See D.N.M. LR Civ. 56.1(b) ("All material facts set forth in the [summary judgment motion] will be deemed undisputed unless specifically controverted.").

[25]The Plaintiffs do not respond to the alleged, undisputed facts in the MSJ.  See MSJ Response at 1-2.  The Court therefore deems this fact undisputed.  See D.N.M. LR Civ. 56.1(b) ("All material facts set forth in the [summary judgment motion] will be deemed undisputed unless specifically controverted.").

[26]the Defendants respond to this statement by explaining that hourly rate jobs are charged to the customer at an hourly rate, and the drivers receive twenty-five percent of the charge.  See Cross Memo. Response ¶ 11, at 1-2.  This statement does not controvert the alleged, undisputed fact in the text, because the driver's twenty-five percent, while not calculated directly from the hours worked, is based on the hours driven.  The Court therefore deems this fact undisputed.  See D.N.M. LR Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[27]the Defendants respond to this statement by explaining that hourly rate jobs are charged to the customer at a bid rate, and the drivers receive twenty-five percent of the charge.  See Cross Response ¶ 12, at 2.  This statement does not controvert the alleged, undisputed fact in the text, because the driver's twenty-five percent is calculated regardless the hours driven.  The Court therefore deems this fact undisputed.  See D.N.M. LR Civ. 56.1(b) ("All material facts set forth in the [summary judgment motion] will be deemed undisputed unless specifically controverted.").

Drivers received about fifty percent of their pay from jobs calculated on an hourly basis and about fifty percent from jobs calculated on a bid basis. See Cross Memo. ¶ 14, at 3 (asserting this fact)(citing Herrera Depo. at 82:18-83:16).[28]

JWS New Mexico's charges to customers for hourly rate jobs might diverge from the hours drivers worked, because JWS New Mexico decreased the hours it charged to customers. See Cross MSJ Response ¶ A, at 3 (asserting this fact)(citing Supplemental Declaration of Dimas Herrera ¶ 5, at 2 (executed on June 22, 2016), filed July 1, 2016 (Doc. 48-1)("Herrera Supp. Decl.")).[29] JWS New Mexico management would cross out the hours on the drivers' job tickets and write in other hours. See Cross MSJ Response ¶ C, at 4 (asserting this fact)(Herrera Supp. Decl. ¶¶ 7, 10-11, at 2-3).[30] For jobs where JWS New Mexico wrote down the hours, JWS New Mexico charged the customer for the revised hours and calculated the drivers' twenty-five percent on those hours. See Cross MSJ Response ¶ E, at 4 (asserting this fact)(citing Herrera Supp. Decl. ¶ 9, at 2).[31]

---

[28]The Plaintiffs state: "Drivers are paid on an hourly basis for about 50% of the jobs they are assigned, and on a bid basis for about 50% of the jobs they are assigned." Cross Memo. ¶ 14, at 6. The Defendants argue that the jobs were charged to the customer on an hourly or bid basis, and the drivers were paid based on that charge. See Cross Response ¶ 4, at 2-3. Because jobs charged at an hourly basis resulted in pay based on hours and jobs charged at a bid rate led to the same pay regardless hours worked, the Court deems this fact undisputed.

[29]The Plaintiffs do not respond to the alleged, undisputed facts in the Cross Response. See Plaintiff's Reply to Defendants [sic] Response to Plaintiff's Cross Motion for Partial Summary Judgment ¶ A, at 2, filed July 15, 2016 (Doc. 50)("Cross Reply"). The Court therefore deems this fact undisputed. See D.N.M. LR Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[30]The Plaintiffs do not respond to the alleged, undisputed facts in the Cross Response. See Cross Reply at 2-4. The Court therefore deems this fact undisputed. See D.N.M. LR Civ. 56.1(b) ("All material facts set forth in the [summary judgment motion] will be deemed undisputed unless specifically controverted.").

[31]The Plaintiffs do not respond to the alleged, undisputed facts in the Cross Response. See

JWS New Mexico paid the drivers hourly for maintaining their trucks. See Cross Memo. ¶ 15, at 6.[32] JWS New Mexico paid the Plaintiffs $12.00 per hour for "yard time," which encompassed tasks such as washing and maintaining the trucks, but the Plaintiffs received significantly more for jobs than for yard time. See MSJ at 4 n.5 (asserting this fact)(citing Corman Depo. at 38:7-18; id. at 44:8-19; Corman Pay Stub at 1 (dated December 31, 2014), filed June 17, 2016 (Doc. 39-7)("Corman Pay Stub")).[33] In 2012, Corman received $92,733.92 for driving jobs and $1,878.00 -- two percent of Corman's total earnings -- for "yard time." See MSJ at 4 n.5 (asserting this fact)(citing Corman Depo. at 44:8-19; Corman Pay Stub at 1).[34]

Before 2000, JWS New Mexico paid truck drivers for overtime worked. See Cross Memo. ¶ 6, at 5 (asserting this fact)(citing Herrera Depo. at 86:20-23).[35] In 2000, K.P. Kauffman directed

_____

Cross Reply at 2-4. The Court therefore deems this fact undisputed. See D.N.M. LR Civ. 56.1(b) ("All material facts set forth in the [summary judgment motion] will be deemed undisputed unless specifically controverted.").

[32]the Defendants clarify that the Plaintiffs are referring to the "yard time." See Response ¶ 15, at 3. This statement does not controvert the alleged, undisputed fact in the text, because "yard time" constituted time for truck maintenance and was compensated on an hourly basis. See Cross Response ¶ 15, at 3. The Court therefore deems this fact undisputed. See D.N.M. LR Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[33]The Plaintiffs do not respond to the alleged, undisputed facts in the MSJ. See MSJ Response at 1-2. The Court therefore deems this fact undisputed. See D.N.M. LR Civ. 56.1(b) ("All material facts set forth in the [summary judgment motion] will be deemed undisputed unless specifically controverted.").

[34]The Plaintiffs do not respond to the alleged, undisputed facts in the MSJ. See MSJ Response at 1-2. The Court therefore deems this fact undisputed. See D.N.M. LR Civ. 56.1(b) ("All material facts set forth in the [summary judgment motion] will be deemed undisputed unless specifically controverted.").

[35]the Defendants do not respond to the alleged, undisputed facts in the Cross Memo. See Cross Response at 1. The Court therefore deems this fact undisputed. See D.N.M. LR Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically

New Mexico to stop paying overtime, and JWS New Mexico has not paid overtime wages for hours over forty hours since 2000. See Cross Memo. ¶ 7-8, at 5 (citing Herrera Depo. at 88:4-7; id. at 88:14-18).[36] Other New Mexico field service providers pay their drivers overtime wages for time over forty hours a week. See Cross Memo. ¶ 9, at 5 (asserting this fact)(citing Lizardo Depo. at 60:23-61:20).[37]

Each pay period, the Plaintiffs received a "pay sheet" listing the jobs they performed. MSJ ¶ 17, at 5 (asserting this fact)(citing Corman Depo. at 65:6-24; De La Torre Depo. at 40:18-41:7; Garcia Depo. at 36:9-19; Lizardo Depo. at 48:17-49:1).[38] These pay sheets reflect that the Plaintiffs received twenty-five percent of the transportation charges. See MSJ ¶ 18, at 5 (asserting this fact)(citing Corman 2015 Jobs, filed June 17, 2016 (Doc. 39-8); De La Torre 2014 Jobs, filed June 17, 2016 (Doc. 39-9); Garcia 2012-13 Jobs, filed June 17, 2016 (Doc. 39-10)).[39] Corman

_____

controverted.").

[36] the Defendants do not respond to the alleged, undisputed facts in the Cross Memo. See Cross Response at 1. The Court therefore deems this fact undisputed. See D.N.M. LR Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[37] the Defendants do not respond to the alleged, undisputed facts in the Cross Memo. See Cross Response at 1. The Court therefore deems this fact undisputed. See D.N.M. LR Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[38] The Plaintiffs do not respond to the alleged, undisputed facts in the MSJ. See MSJ Response at 1-2. The Court therefore deems this fact undisputed. See D.N.M. LR Civ. 56.1(b) ("All material facts set forth in the [summary judgment motion] will be deemed undisputed unless specifically controverted.").

[39] The Plaintiffs do not respond to the alleged, undisputed facts in the MSJ. See MSJ Response at 1-2. The Court therefore deems this fact undisputed. See D.N.M. LR Civ. 56.1(b) ("All material facts set forth in the [summary judgment motion] will be deemed undisputed unless specifically controverted.").

received $95,187.92 in 2012, $98,371.43 in 2013, and $97,481.91 in 2014.  See MSJ ¶ 19, at 6

(asserting this fact)(citing Corman Pay Stub at 1-3).[40]  De La Torre made $90,526.24 in 2013 and

$99,331.43 in 2014.  See MSJ ¶ 19, at 6 (asserting this fact)(citing De La Torre Pay Stubs at 1-2,

filed June 17, 2016 (Doc. 39-11)).[41]  Garcia made $91,923.24 in 2014.  See MSJ ¶ 19, at 6 (citing

Garcia Pay Stub at 1, filed June 17, 2016 (Doc. 39-12)).[42]

## PROCEDURAL BACKGROUND

On October 12, 2015, the Plaintiffs filed the Complaint, alleging that: (i) the Defendants

violated the Fair Labor Standards Act, 29 U.S.C. §§ 201 to 204, 206 to 207, 209 to 218, 218b,

218c, 219, ("FLSA"), when they refused to pay the Plaintiffs' overtime wages for hours over forty

hours a week, see Complaint ¶¶ 22-30, at 3-4; and (ii) the Defendants violated the NMMWA when

they refused to pay the Plaintiffs' overtime wages for hours over forty hours a week, see Complaint

¶¶ 31-37, at 4-5.  The Defendants answered on December 18, 2015.  On June 17, 2016, the parties

filed the MSJ and the Cross MSJ, which the Court will discuss in detail below.  The Defendants

designated Dimas Herrera, the general manager and vice president of JWS New Mexico to testify

---

[40]The Plaintiffs do not respond to the alleged, undisputed facts in the MSJ.  See MSJ Response at 1-2.  The Court therefore deems this fact undisputed.  See D.N.M. LR Civ. 56.1(b) ("All material facts set forth in the [summary judgment motion] will be deemed undisputed unless specifically controverted.").

[41]The Plaintiffs do not respond to the alleged, undisputed facts in the MSJ.  See MSJ Response at 1-2.  The Court therefore deems this fact undisputed.  See D.N.M. LR Civ. 56.1(b) ("All material facts set forth in the [summary judgment motion] will be deemed undisputed unless specifically controverted.").

[42]The Plaintiffs do not respond to the alleged, undisputed facts in the MSJ.  See MSJ Response at 1-2.  The Court therefore deems this fact undisputed.  See D.N.M. LR Civ. 56.1(b) ("All material facts set forth in the [summary judgment motion] will be deemed undisputed unless specifically controverted.").

as JWS New Mexico' rule 30(b)(6) corporate representative.[43]  See Cross Memo. ¶ 5, at 5 (citing Herrera Dep. at 7:13-15; id. at 28:10-12; id. at 5:11-13).

### 1. **The MSJ.**

In the MSJ, the Defendants ask that the Court grant summary judgment for them on the Plaintiffs' NMMWA claim, because the truck drivers fit the exception under the NMMWA for employees paid on a "commission," or alternatively, "piecework" or "flat rate" basis.  MSJ at 2. The Defendants cite the exception to the NMMWA for "employee[s]," including "salespersons or employees compensated upon piecework, flat rate schedules, or commission basis."  MSJ at 7 (quoting N.M. Stat. Ann. § 50-4-21(C)(5)).  The Defendants argue that the truck drivers received twenty five percent of what JWS New Mexico charged to customers and that this payment program brings the Plaintiffs into the NMMWA exception.  MSJ at 7.

Regarding the exception for employees paid on a "commission" basis, the Defendants argue that, in interpreting the NMMWA, New Mexico courts follow federal law construing the FLSA.  MSJ at 7 (citing Armijo v. Wal-Mart Stores, Inc., 2007-NMCA-120, ¶ 47, 168 P.3d 129,

---

[43]Rule 30(b)(6) of the Federal Rules of Civil Procedure provides:

> In its notice or subpoena, a party may name as the deponent a public or private corporation, a partnership, an association, a governmental agency, or other entity and must describe with reasonable particularity the matters for examination. The named organization must then designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf; and it may set out the matters on which each person designated will testify. A subpoena must advise a nonparty organization of its duty to make this designation. The persons designated must testify about information known or reasonably available to the organization. This paragraph (6) does not preclude a deposition by any other procedure allowed by these rules.

Fed. R. Civ. P. 30(b)(6).

144; Garcia v. Am. Furniture Co., 1984-NMCA-090, ¶ 13, P.2d 934, 937). The Defendants argue

that the NMMWA applies to employees who work on a commission basis, see MSJ at 8-9 (citing

N.M. Stat. Ann. § 50-4-2(C)(5)), and a compensation system need not use the word "commission"

to be a commission system, see MSJ at 8 (citing Yi v. Sterling Collision Ctrs., Inc., 480 F.3d 505,

508-11 (7th Cir. 2007)). The Defendants discussed four factors to demonstrate that the

compensation system is commission based: (i) the employees are only compensated on a "sale,"

MSJ at 9 (citing Alvarado v. Corporate Cleaning Servs., Inc., 782 F.3d 365, 367 (7th Cir. 2015));

(ii) the compensation is proportional to the sales price, see MSJ at 9 (citing Alvarado v. Corporate

Cleaning Servs., Inc., 782 F.3d at 367; Charlot v. Ecolab, Inc., 136 F. Supp. 3d 433, 457 (E.D.N.Y.

2015)(Matsumoto, J.)); (iii) the pay is for work involving irregular hours, see MSJ at 9-10 (citing

Alvarado v. Corporate Cleaning Servs., Inc., 782 F.3d at 368; Matrai v. DirecTV, LLC, 168

F. Supp. 3d 1347, 1365 (D. Kan. 2016)(Crow, J.)); and (iv) the pay is a performance-based

incentive for the employees to increase their incomes, see MSJ at 11 (citing Owepetu v.

Nationwide CATV Auditing Servs., Inc., No. 5:10-cv-18, 2011 WL 883703, at *4 (D. Vt. March

11, 2011)(Reiss, C.J.)). The Defendants contend that JWS New Mexico's compensation system

satisfies these factor: (i) the Plaintiffs receive twenty-five percent of transportation charges after a

job, see MSJ at 9; (ii) the Plaintiffs always receive twenty-five percent of the amount charged

customers, see MSJ at 9 (citing Charlot v. Ecolab, Inc., 136 F. Supp. 3d at 457 (nothing that

proportionality is satisfied when the employees received a percentage of the price charged));

(iii) the Plaintiffs work irregular daily hours, and their hours vary throughout the year, see MSJ at

9-10; and (iv) the Plaintiffs are motivated to obtain more pay by completing jobs faster, see MSJ

at 11.

In the alternative, the Defendants argue that the Plaintiffs are paid on a "piecework" or "flat rate" basis. Citing Black's Law Dictionary (10th ed. 2014), the Defendants contend that "piecework" means "[w]ork done or paid for by the piece or job," and JWS New Mexico paid the Plaintiffs by the job. MSJ at 12. "Flat rate" means "a charge that is the same in all cases, not varying in proportion with something" and exists when an employee is paid per job, according to the Defendants MSJ at 12-14 (citing New Oxford American Dictionary (2001); Olivo v. Crawford Chevrolet Inc., 799 F. Supp. 2d 1237 (D.N.M. 2011)(Black, J.)(concluding that employees "paid by the job" for painting and repairing cars worked at a "flat rate")). The Plaintiffs' proportion of the customer's charge did not vary. See MSJ at 13-14.

2. **The MSJ Response.**

The Plaintiffs filed the MSJ Response on July 1, 2016. See MSJ Response at 1. The Plaintiffs begin by arguing that the Defendants contend that the Plaintiffs should not receive overtime, because the Plaintiffs have a high-income level. See MSJ Response at 2-4. The Plaintiffs assert that this argument about the Plaintiffs' income fails, because the NMMWA contains no "highly-compensated employee" exemption, like the FLSA, and even if the NMMWA had an exception like the FLSA's, the Plaintiffs would not fall under the exception. See MSJ Response at 2-3 (citing 29 C.F.R. § 541.601; Cruz v. Lawson Software, Inc., 764 F. Supp. 2d 1050, 1062 (D. Minn. 2011)(Davis, C.J.); Schaefer-LaRose v. Eli Lilly & Co., 663 F. Supp. 2d 674, 683 (S.D. Ind. 2009)(Barker, J.)). Further, the Plaintiffs contend that NMMWA's purpose is to limit the hours that employees work. See MSJ Response at 3 (citing N.M. Stat. Ann. § 50-4-19; Klinedinst v. Swift Invs., Inc., 260 F.3d 1251, 1258-59 (11th Cir. 2001)(Restani, J., dissenting in part); Mechmet v. Four Seasons Hotels, Ltd., 826 F.2d 1173, 1175-76 (7th Cir. 1987); Donovan

v. Brown Equip. & Serv. Tools, Inc., 666 F.2d 148, 152 (5th Cir. 1982); Wilson Oil Co. v. Hardy, 1945-NMSC-013, ¶ 24, 164 P.2d 209, 213-14; N.M. Dep't of Labor v. A.C. Elec., Inc., 1998-NMCA-141, ¶ 15, 965 P.2d 363, 366).

Regarding whether JWS New Mexico compensated the Plaintiffs on a commission basis, the Plaintiffs respond that the factors to determine whether a compensation program is based on a commission are: (i) the commission is a proportion of the consumer's price; (ii) the commission is decoupled from the employee's time worked; (iii) the work is irregular; and (iv) the program does not "offend the purposes of the Act."  MSJ Response at 4-5 (citing Casanova v. Gold's Tex. Holdings Grp., Inc., NO 5:13-CV-1 161-DAE, 2016 WL 1241548, at *3 (W.D. Tex. March 23, 2016)(Ezra, J.)).  The Plaintiffs argue that JWS New Mexico's program fails the second, third and fourth factors: (i) JWS New Mexico does not decouple the Plaintiffs' pay from their hours, because JWS New Mexico pays the Plaintiffs based on an hourly rate, see MSJ Response 4-7 (citing Casanova v. Gold's Tex. Holdings Grp., Inc., 2016 WL 1241548, at *8 (concluding that the compensation system was not decoupled from time when a physical trainer received more money the more hours worked); Matrai v. DirecTV, LLC, 168 F. Supp. 3d at 1365 (noting that a pay program was related to hours worked when, to make more money, the installers could work more hours in the day)); (ii) the exception for commission pay exists, because, under most commission pay programs, the employee's irregular hours evens to forty hours across several weeks, but the Plaintiffs work over forty hours every week, see MSJ Response 7-9 (citing Donovan v. Brown Equip. & Servs. Tools, Inc., 666 F.2d at 154 (concluding that hours were not irregular when the hours were consistently over forty hours)(citing Walton v. United Consumers Club, Inc., 786 F.2d 303, 307 (7th Cir. 1986)(noting that "it is unlikely that Congress meant to require employers to

pay overtime in the lean weeks when the fat weeks more than make up")); <u>Kelly v. A1 Tech.</u>, No. 09 CIV. 962 LAK MHD, 2010 WL 1541585, at *8-9 (S.D.N.Y. April 12, 2010)(Dolinger, J.)(explaining that employers did not want to pay overtime to employees whose total hours may not exceed forty hours per week in a pay period); <u>English v. Ecolab, Inc.</u>, No. 06 CIV. 5672 (PAC), 2008 WL 878456, at *16 (S.D.N.Y. March 31, 2008)(Crotty, J.)(recognizing that service specialists could work more than forty hours some weeks and less than forty hours other weeks, but earn more than an employee working forty hours every week); and (iii) the NMMWA's purposes are to protect against overworked drivers, open jobs for drivers who desire reasonable hours, and encourage employers to hire more drivers, and exempt JWS New Mexico from the statute would defeat these purposes, <u>see</u> MSJ at 9 (citing <u>Mechmet v. Four Seasons Hotels, Ltd.</u>, 825 F.2d at 1175-76 (explaining the purposes for the NMMWA)).

### 3. <u>The MSJ Reply</u>.

The Defendants responded on July 15, 2016. The Defendants argue that by failing to address the argument that the Plaintiffs are exempted from the NMMWA in the MSJ Response, the Plaintiffs concede that the "flat rate" or "piecework" exemption applies. <u>See</u> MSJ Reply at 3 (citing <u>Hinsdale v. City of Liberal</u>, 19 F. App'x 749, 768-69 (10th Cir. 2001)(unpublished)(affirming summary judgment where the party did not address the other's argument in the summary judgment response)). In response to the Plaintiffs' arguments that JWS New Mexico did not pay the Plaintiffs on a commission basis, the Defendants reply that the pay was decoupled from the hours worked, because JWS New Mexico paid the Plaintiffs a proportion of the cost to customers and that cost did not reflect the actual hours driven, because JWS reduced excessive hours. <u>See</u> MSJ Reply at 5. The Defendants contend that the Plaintiffs cannot rely on

Casanova v. Gold's Texas Holdings Group, Inc., because, in that case, the trainers received compensation in a one-to-one ratio for all hours worked, but JWS New Mexico compensated the Plaintiffs in the aggregate in a manner decoupled from the hours worked, as the Plaintiffs could finish an hourly rate job quickly to move onto a bid rate job. See MSJ at 6 (citing Casanova v. Gold's Tex. Holdings Grp., Inc., 2016 WL 1241548, at *8). Further, according to JWS New Mexico and Kaufmann Co., Olivo v. Crawford Chevrolet Inc. suggests that the "commission" exception applies even if the employer does not pay the employees entirely on a commission basis. See MSJ at 6 (citing Olivo v. Crawford Chevrolet Inc., 799 F. Supp. 2d at 14-15). Regarding the Plaintiffs irregular hours, the Defendants dispute that Donovan v. Brown Equipment and Service Tools, Inc. applies, because it speaks to an exception other than the "commission" exemption, and the other cases cited either concluded that the employees were "commissioned," MSJ Reply at 7 (citing Walton v. United Consumers Club, Inc., 786 F.3d), or cite only Yi v. Sterling Collision Centers, Inc., with which other courts have disagreed, see MSJ Reply at 7 (citing Kelly v. A1 Tech, No. 09 Civ. 962(LAK)(MHD), 2010 WL 1541585 (S.D.N.Y. April 12, 2010)(Kaplan, J.); English v. Ecolab, Inc., No. 06 Civ. 5672(PAC), 2008 WL 878456 (S.D.N.Y. March 31, 2008)(Crotty, J.)). The Defendants cite Matrai v. DirecTV, LLC, 168 F. Supp. 3d 1347, and Crawford v. Saks & Co., CIVIL ACTION NO. H-14-3665, 2016 WL 3090781 (S.D. Tex. June 2, 2016)(Rosenthal, J.), as cases in which the courts determined that the employees worked "irregular hours" without addressing whether the employees worked more or less than forty hours a week. MSJ Reply at 8. Finally, the Defendants argue that the Plaintiffs do not cite a case discussing the NMMWA's purposes, but the Plaintiffs cite cases considering only the FLSA, and the NMMWA is broader

than the FLSA, because it includes exemptions for "piecework" and "flat rate" employees. MSJ Reply at 9-10.

4. **The Cross MSJ.**

The Plaintiffs filed the Cross MSJ on June 17, 2016. The Plaintiffs aver that the Defendants must prove that the Plaintiffs "plainly and unmistakably" fall within an NMMWA exemption. See Cross Memo. at 7 (citing Rodriguez v. Whiting Farms, Inc., 360 F.3d 1180, 1184 (10th Cir. 2004)). The Plaintiffs argue that no exemption to the NMMWA applies to the Plaintiffs, and, according to the Plaintiffs, the Defendants are liable for overtime pay. See Cross Memo. at 1. The Plaintiffs contend that JWS New Mexico compensated them based on their hours worked. See Cross Memo. at 8-9. Regarding the exemption for "piecework" systems, the Plaintiffs argue that "piecework" is "work in which you are paid for each thing you make or do and not for the amount of time you work," Cross Memo. at 9 (citing Merriam-Webster's Online Dictionary, http://www.merriam-webster.com/dictionary/piecework), and more than fifty percent of the Plaintiffs' compensation is related to the hours worked, see Cross Memo. at 10. Regarding the exemption for "flat rate" compensation, the Plaintiffs cite Burch v. Foy, 1957-NMSC-017, 308 P.2d 199 to argue that the phrase "flat rate schedule" applies only in the automobile repair industry, see Cross Memo. at 10-11, and that Olivo v. Crawford Chevrolet Inc. suggests that compensation is not on a flat rate basis when an employee is a "mixed-status employee." Cross MSJ Motion at 12 (quoting Olivo v. Crawford Chevrlot Inc., 799 F. Supp. 2d at 1242). Further, according to the Plaintiffs, flat rate systems decouple pay from hours worked and incentivize employees to work efficiently. See MSJ at 12-13 (citing Yi v. Sterling Collision Ctrs., 480 F.3d at 509; Klinedinst v. Swift Invs., Inc., 260 F.3d at 1254-55; Wage and Hour Division of the Department of Labor's Field Operations

Handbook, Section 21h04(d), https://www.dol.gov/whd/FOH/FOH_Ch21.pdf ("Wage and Hour Handbook")).  According to the Plaintiffs, because more than fifty percent of their pay relates to their hours worked, JWS New Mexico's compensation program is not a flat rate system.

Regarding whether the Plaintiffs work on a commission basis, the Plaintiffs cite a three-part test.  See Cross Memo. at 14.  The Plaintiffs contend that a compensation system is a commission program when: (i) the compensation is "tied to customer demand"; (ii) the plan provides "performance-based incentives for the employee"; and (iii) the value of the services sold is proportional to the "rate paid the employee."  Cross Memo. at 14 (citing Johnson v. Wave Comm'n GR LLC, 4 F. Supp. 3d 423, 442 (N.D.N.Y. 2014)(Hurd, J.)(quoting Owopetu v. Nationwide CATV Auditing Servs., Inc., No. 5:10-cv-18, 2011 WL 883703, at *3 (D. Vt. March 11, 2011)(Reiss, C.J.)).  According to the Plaintiffs, JWS New Mexico pays the Plaintiffs for hourly rate jobs based on the hours that the Plaintiffs work, and the exemption does not apply to employees paid only partly on a commission basis.  See Cross MSJ Motion at 15-19.

**5.** **The Cross MSJ Response.**

The Defendants responded to the Plaintiffs' Cross MSJ.  See Cross MSJ Response. Initially, the Defendants reply that "there is no heightened evidentiary requirement on employers seeking to prove an . . . exemption" here.  See MSJ at 4 (citing Lederman v. Frontier Fire Prot., Inc., 685 F.3d 1151, 1158 (10th Cir. 2012)). the Defendants then aver that the Plaintiffs conflate the "commission" exclusion with the "flat rate" and "piecework" exclusions and that the Plaintiffs cite FLSA cases, which are only relevant to the "commission" exemption.  See Cross MSJ Response at 5.

According to the Defendants, cases interpreting the "commission" exclusion from the FLSA are relevant, and <u>Matrai v. DirecTV, LLC.</u>, 168 F. Supp. 3d 1347, is the only case decided by a court -- district or appellate -- in the Tenth Circuit delineating a test for the exemption. <u>See</u> Cross MSJ Response at 6 & n.6. The Defendants describe the test's three elements: (i) employees are compensated on a sale; (ii) employees' compensation is proportional to the sales price; and (iii) employees work irregular hours. <u>See</u> Cross MSJ Response at 6-7. The Defendants explain that: (i) the Plaintiffs receive twenty-five percent of JWS New Mexico's charge to the customer, so the Plaintiffs are compensated on a sale, <u>see</u> Cross MSJ Response at 6-7 (citing <u>Alvarado v. Corporate Cleaning Servs., Inc.</u>, 782 F.3d at 367); (ii) the Plaintiffs always receive twenty-five percent of the transportation charge, thus the compensation is proportional to the sales price, <u>see</u> Cross MSJ Response at 7 (citing <u>Alvarado v. Corp Cleaning Servs., Inc.</u>, 782 F.3d at 367; <u>Charlot v. Ecolab, Inc.</u>, 136 F. Supp. 3d at 457 (concluding that the proportionality element is satisfied when employees receive a percentage of the money received)); and (iii) the Plaintiffs work irregularly, because jobs differ in length, and JWS New Mexico's business fluctuates throughout the year, <u>see</u> Cross MSJ Response at 7-8. Further, the Defendants contend that the Plaintiffs' work is decoupled from the hours worked and provides a performance-based incentive, because the Plaintiffs received compensation pay based on bid rates, which disregard the hours worked, and because, for hourly rate jobs, JWS New Mexico might write down the hours charged to the customer. <u>See</u> Cross MSJ Response at 8-10. The Defendants note that commissions systems under the FLSA may consider the estimated hours when charging customers. <u>See</u> MSJ at 11 (citing <u>Yi v. Sterling Collision Ctrs.</u>, 480 F.3d at 509-11; <u>Herrera v. TBC Corporate</u>, 18 F. Supp. 3d 739, 740, 747 (E.D. Va. 2014)(Hudson, J.)). The Defendants repeat that, in the aggregate, the Plaintiffs'

hours were decoupled from their pay. The Defendants also dispute that JWS New Mexico did not intend the pay program to incentivize the Plaintiffs to perform efficiently and explain that JWS New Mexico's intent is irrelevant, because the compensation program objectively incentivizes efficiency to avoid having hours written down and to receive new assignments. See Cross MSJ Response at 12. Finally, the Defendants disagree with the Plaintiffs that, for the exemption to apply, the JWS New Mexico must always compensate the Plaintiffs on a commission basis, and the Defendants argue that the order in Olivo v. Crawford Chevrolet Inc., in which the court applied the exclusion, supports their argument, rather than the Plaintiffs'. See Cross MSJ Response at 13-14 (citing Olivo v. Crawford Chevrolet Inc., CV 10-782 BB/LFG, Order ¶ 21, at 4, filed January 12, 2012; id. ¶ 3, at 8 (Doc. 149)).

The Defendants elaborate that, alternatively, the "piecework" or "flat rate" exceptions apply. The Defendants cite the plain meaning of "flat rate," MSJ at 16 (citing New Oxford American Dictionary), and aver that the Supreme Court of New Mexico, in Burch v. Foy, concluded that "flat rate schedule" has a particular meaning only in the automobile industry, and not that the term applies only to the automobile industry, see Cross MSJ Response at 16 (citing Burch v. Foy, 1957-NMSC-017, ¶ 4, 308 P.2d at 201). Further, the Defendants note that Yi v. Sterling Collision Centers, Klinedinst v. Swift Investments, Inc., and the Wage and Hour Handbook only discuss commission systems, and Honorable Bruce Black, United States District Judge for the United States District Court of New Mexico, in Olivo v. Crawford Chevrolet Inc., concluded only that, without the waiting time, the employer paid the employees on a "piecework" basis. Cross MSJ Response at 16-17 (citing Yi v. Sterling Collision Ctrs., 480 F.3d at 509;

Klinedinst v. Swift Invs., Inc., 260 F.3d at 1254-56; Olivo v. Crawford Chevrolet Inc., 799 F. Supp. 2d at 1242; Wage and Hour Handbook, Section 21h04(d)).

In response to the Plaintiffs' arguments that the Plaintiffs are not paid on a "piecework" basis, the Defendants reply that only one case that the Plaintiffs cited defines "piecework" or addresses whether the compensation system was on a "piecework" basis. See Cross MSJ Response at 18-19. According to the Defendants, the one case the Plaintiffs cite that defines "piece rate" does so only to distinguish such compensation from a "commission" system. See Cross MSJ Response at 19 (citing Alvarado v. Corp Cleaning Servs., Inc., 782 F.3d at 367). The Defendants repeat the argument from their MSJ that the Plaintiffs are compensated on a "piecework" basis, based on the ordinary meaning of "piecework" and on Olivo v. Crawford Chevrolet Inc., which defines piecework as payment for a job, and not for items produced, as the Plaintiffs want to define "piecework." See Cross MSJ Response at 20 (citing Olivo v. Crawford Chevrolet Inc., 799 F. Supp. 2d at 1242; Black's Law Dictionary (10th ed. 2014)). The Defendants aver that, because the cases that the Plaintiffs cite do not address the definition of "piecework" or legal issues hinging on defining "piecework," the Plaintiffs cannot support their arguments that "piecework" compensation systems must incentivize employees or decouple hours from pay. See Cross MSJ Response at 21. Finally, the Defendants assert that JWS New Mexico did not pay the Plaintiffs by hours worked. See Cross MSJ Response at 21-22.

6.      **The Cross MSJ Reply.**

The Plaintiffs reiterate their argument about the standard to prove that an exemption applies on summary judgment. See Cross MSJ Reply at 4-5. The Plaintiffs then argue that JWS New Mexico's "write downs" are irrelevant, because, in most cases, JWS New Mexico charged for the

full hours worked.  See Cross MSJ Reply at 5-6.  Further, the Plaintiffs depict JWS New Mexico's "write downs" as unlawful refusals to pay the Plaintiffs for hours worked, and the Plaintiffs argue that JWS New Mexico's statements about write downs contradicted JWS New Mexico's prior statements under oath.  See Cross MSJ Reply at 5-6.  The Plaintiffs likewise reiterate that JWS New Mexico paid the Plaintiffs more than half the time based on their hours, and paid the Plaintiffs for "yard time," which was calculated on an hourly basis.  See Cross MSJ Reply at 6-7.  Regarding the "piecework" exemption, the Plaintiffs differentiate between "piecework" and "job rate" systems, arguing that job rate systems involve payments per job and that the NMMWA does not exempt such pay programs.  See Cross MSJ Reply at 8 (citing 29 C.F.R. § 778.112; Itzep v. Target Corp., No. SA-06-CA-568-XR, 2010 WL 2278349, at *13 (W.D. Tex. June 4, 2010)(Rodriguez, J.)(granting overtime pay to employees on a job rate system)).  The Plaintiffs also repeat their arguments about the definition for "flat rate," the NMMWA's purpose, and the exemption's inapplicability to employees paid on a partially exempt basis.  See Cross MSJ Reply at 8-12.

7.      **The Hearing.**

The Court held a hearing on the MSJ and Cross MSJ on July 20, 2016.  The Court began the hearing by explaining its impression that the commission exemption applies largely to sales work; the piecework exemption is implicated generally when an employee receives pay for items produced, and the flat rate exemption applies when an employee is compensated for a task, like fixing a car, regardless the time required to complete the task.  See Draft Transcript of Hearing at

4:11-5:11 (taken July 20, 2016)(Court)("Tr.").[44]  The Court directed the parties to clarify how JWS New Mexico paid the Plaintiffs, because the Court surmised that JWS New Mexico paid the Plaintiffs hourly, with a commission in addition to the hourly rate.  See Tr. at 5:22-6:16 (Court).  The Court also inquired whether it could write one factual section for both the MSJ and the Cross MSJ, because the parties did not dispute many facts.  See Tr. at 6:17-7:10 (Court).  The parties opined that a single opinion would be appropriate.  See Tr. at 7:16-18 (Johnson); id. at 34:24-35:3 (Milstein).

The Defendants clarified that JWS New Mexico paid the drivers twice a month based solely on twenty-five percent "of the transportation charge to the customer," regardless the bid on which JWS New Mexico charged the customer.  Tr. at 7:19-8:5 (Johnson).  The Defendants described the three bid categories, which the Defendants listed in the MSJ, and noted that they disagreed with the Plaintiffs, because for hourly bid jobs, JWS New Mexico charged the customer for the hours to perform the job.  See Tr. at 9:2-10:11 (Johnson).  The Defendants explained that JWS New Mexico frequently wrote down the hours for the hourly bid rate jobs, thus the payment program resembled the automobile repair cases, which courts treat as cases about commission systems.  See Tr. at 10:11-11:15 (Johnson).  The Defendants further noted that the exemption applies to employees other than sales employees.  See at Tr. at 11:16-12:18 (Johnson).  The Defendants responded to the Plaintiffs' statements describing the write downs as unlawful by noting that JWS New Mexico wrote down the charges to the customer, thus the hourly bid rate was more "a target number of hours," and the Plaintiffs' arguments miss the point.  Tr. at 13:22

---

[44]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

(Johnson).  See Tr. at 12:19-16:9 (Johnson).  Further, the Defendants argued that the Plaintiffs cite Corman's deposition testimony as evidence that JWS New Mexico did not frequently write down the Plaintiffs' time, but Corman has no personal knowledge how JWS New Mexico calculates jobs other than his.  See Tr. at 14:2-14:14 (Johnson).  According to the Defendants, the Plaintiffs also cited a deposition exhibit showing only a selective sampling of job tickets to support their argument that JWS New Mexico only infrequently wrote down the hours.  See Tr. at 15:9-21 (Johnson).  The Defendants also contended that JWS New Mexico did not provide contradictory statements, because the Plaintiffs' counsel did not ask questions related to the actual hours worked. See Tr. at 16:10-25 (Johnson).  Regarding "yard time," the Defendants noted that the Plaintiffs provide no evidence to show that the yard time is more than de minimis.  See Tr. at 17:1-24 (Johnson).  The Defendants reiterated that piecework "can apply to being by the job."  Tr. at 18:16 (Johnson).  Finally, the Defendants argued that while many cases which the Plaintiffs cited consider the FLSA and that, given this emphasis, the Plaintiffs cannot support their contention that a job rate system is not exempted under the NMMWA or that hours must be decoupled from pay under the NMMWA.  See Tr. at 18:17-20:7 (Johnson).

The Court asked whether a payment system could fit into more than one exemption in the NMMWA, and the Defendants stated that this could happen.  See Tr. at 20:10-21:8 (Court, Johnson).  Answering the Court's questioning, the Defendants clarified that about fifty percent of the Plaintiffs' pay was based on hourly rate jobs, which are charged to the customer based on the time to complete the jobs.  See Tr. at 24:1-23 (Johnson).  The Defendants further explained that JWS New Mexico told its drivers that they would receive twenty-five percent of the charge.  See Tr. at 25:15-20 (Johnson).  The Defendants agreed that the amount which the Plaintiffs make is

irrelevant to whether an exemption applies.  See Tr. at 26:4-15 (Court, Johnson).  In response to the Court's questions, JWS New Mexico clarified that it does not convert the Plaintiffs' pay to pay per hour and that it paid the twelve dollars per hour for de minimis time the Plaintiffs spent in the yard.  See Tr. at 26:16-27:19 (Court, Johnson).

The Plaintiffs argue that JWS New Mexico's pay program is similar to that in Casanova v. Gold's Texas Holdings Group, Inc., which involved personal trainers, because the Plaintiffs are "paid that percentage based on each hour they worked."  Tr. at 28:10-11 (Milstein).  See Tr. at 28:8-12 (Milstein).  The Plaintiffs contended that JWS New Mexico informed the Plaintiffs that they would receive between $17.18 and $22.50 an hour, and that the yard time plus the hourly rate jobs constituted more than fifty percent of the Plaintiffs' pay.  See Tr. at 28:23-29:11 (Milstein). The Plaintiffs averred that other companies serving the oil industry pay their employees by the hour, and that JWS New Mexico's practice allows JWS New Mexico to compete unfairly and raises safety concerns because of potentially tired drivers.  See Tr. at 29:12-30:10 (Milstein).  The Plaintiffs then reiterated the arguments from their Cross MSJ and MSJ Response why the compensation program does not fall under an NMMWA exemption.  See Tr. at 30:11-33:9 (Milstein).

The Court queried what policy would lead New Mexico to prevent employers from "com[ing] up with a creative generous way of paying their employees."  Tr. at 33:18 (Court).  The Plaintiffs replied that overtime laws encourage employers to hire more employees.  See Tr. at 33:25-34:12 (Milstein).  In response to the Court's question whether a payment program could fit more than one exemption, the Plaintiffs replied that "employees who are compensated in part upon [one] of these three exemptions" are not exempted.  Tr. at 35:14-16 (Misltein).  See Tr. at 35:4-

36:10 (Court, Milstein). The Court asked: "What I understand Mr. Johnson to be explaining to me . . . is that only 2 percent is based on a 12 dollar an hour rate. And that 98 percent of their income is 25 percent of the job." Tr. at 36:16-18 (Court). The Plaintiffs responded that JWS New Mexico did not pay the Plaintiffs for all yard time, so the two percent might be inaccurate, and that, regardless the Defendants' description, the Plaintiffs received $22.50 per hour for hourly rate jobs. See Tr. at 36:20-37:16 (Milstein).

> The Court posed a hypothetical to the Plaintiffs:
>
> Let's say you had a company that was going out to an oil rig and telling Chevron, okay[, w]e're going to charge you $50 an hour to haul this brine water away from the rig. We're going to charge you $50 an hour, and we estimate that it's going to take eight hours so we're going to charge you a flat rate of $450 plus tax. If they did that, that's clearly based upon hours[,] but they turn around to their employees and say, "We're going to give you 25 percent of the job[;] we're going to give you 25 percent of $450. So we're going to give you [$112.50]." I could ignore what the company is saying to the purchaser of the product. Even though they're clearly calculating on an hour, [they] could clearly be paying the employee based upon you know, just a flat commission. . . . Would you agree that . . . a company could do that[?]

Tr. at 37:21-38:16 (Court). The Plaintiffs opined that JWS New Mexico did with hourly bid jobs what the Court described, but, for hourly rate jobs, JWS New Mexico charged the customer for the hours worked. See Tr. at 38:17-40:10 (Milstein, Court). The Defendants averred that JWS New Mexico told the employees that they would receive twenty-five percent of what JWS New Mexico charged the customers. See Tr. at 44:6-45:12 (Johnson).

Responding to a question from the Court, the Plaintiffs clarified that the New Mexico Legislature's concerns about safety related to all overworked employees -- not simply truck drivers -- because the NMMWA applies to all employees. See Tr. at 40:11-41:6 (Court, Milstein). The Defendants noted that the DOT regulates the drivers, thus the policy concerns about safety are not

as strong as the Plaintiffs would suggest.  See Tr. at 45:13-24 (Johnson).  The Defendants also disputed the idea that they were "trying [to] get a leg up on the competition."  Tr. at 46:1 (Johnson).

In response to the Court's question about the exemption that most concerned the Plaintiffs, the Plaintiffs identified the flat rate exception, which includes employers who paid employees for the estimated hours to complete a task.  See Tr. at 41:13-42:7 (Court, Milstein).  The Defendants admitted that they do not know which exemption best fits JWS New Mexico's payment program, but they noted that more cases exist discussing the commission exemption, because the FLSA incorporates the same exemption.  See Tr. at 47:11-48:7 (Johnson).

The Court asked whether the parties had found other states with similar statutes, and the Plaintiffs responded that New Mexico's statute is broader than other statutes, because the exemptions seem to apply when employees receive partially exempt pay.  See Tr. at 42:8-43:4 (Milstein).  According to the Plaintiffs, "absurd" results would come from reading the exemption to apply to when an employee received any amount of exempt pay.  Tr. at 43:7 (Milstein).  See id. at 43:7:24 (Milstein).  According to the Defendants, no other state has a statute with language comparable to the NMMWA.  See Tr. at 48:8-48:22 (Johnson, Court).  The Plaintiffs clarified that the Alaska statute provides an exemption for flat rate mechanics in the automobile industry.  See Tr. at 51:21-52:6 (Milstein).  At the Court's prompting, the Plaintiffs agreed with the Court that, in interpreting the NMMWA, the Court should look to cases discussing the FLSA, but the Plaintiffs reminded the Court that the State of New Mexico passed the NMMWA to "be more protective than FLSA."  Tr. at 52:18-19 (Milstein).  See Tr. at 52:7-53:2 (Court, Milstein).  The Plaintiffs agreed with the Court that, because the NMMWA includes "flat rate" and "piecework"

exemptions, the NMMWA has broader exemptions than the FLSA.  <u>See</u> Tr. at 53:3-53:19 (Court, Milstein).

Regarding flat rate systems, the Plaintiffs explained that, in <u>Bunch v. Foy</u>, the Supreme Court of New Mexico indicated that it could not determine whether flat rate systems existed outside the automobile industry, and, in <u>Yi v. Sterling Collision Centers</u> and <u>Klinedinst v. Swift Investments, Inc.</u>, federal courts agreed that flat rate systems were commission systems, thus, flat rate systems have to satisfy the tests.  <u>See</u> Tr. at 53:20-54:18 (Court, Milstein).  The Court inquired why flat rate systems would be limited to the automobile industry, and the Plaintiffs admitted: "I don't know of a printed reason why."  Tr. at 55:25-26:1 (Milstein).  <u>See</u> Tr. at 55:14-56:4 (Court, Milstein).  At the Court's prompting, the Plaintiffs reiterated, in closing, that the Plaintiffs' pay was not decoupled from their hours, thus no exemption applied.  <u>See</u> Tr. at 56:5-56:20 (Court, Milstein).

## <u>LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT</u>

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'"  <u>Herrera v. Santa Fe Pub. Sch.</u>, 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(quoting <u>Bacchus Indus., Inc. v. Arvin Indus., Inc.</u>, 939 F.2d 887, 891 (10th Cir. 1991)).  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)("<u>Celotex</u>").

Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, <u>or by directing the court's attention to the fact that the non-moving party lacks</u>

> evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323-25. On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment." Cardoso v. Calbone, 490 F.3d 1194, 1197 (10th Cir. 2007).

Plustwik v. Voss of Nor. ASA, No. 2:11-cv-757, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.)(emphasis added). "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." Celotex, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[45] Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial. See Celotex, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)("Liberty Lobby"). In American Mechanical Solutions, LLC v. Northland Process Piping, Inc., the Court granted summary judgment for the defendant when the plaintiff did not offer expert evidence supporting causation or proximate causation in its breach-of-contract or breach-of-the-implied-warranty-of-merchantability claims. 184 F. Supp. 3d 1030, 1075 (D.N.M. 2016)(Browning, J.). The Court reasoned that the plaintiff could prove neither the breach-of-contract claim's causation requirement nor the breach-of-the-implied-warranty-of-merchantability claims' proximate-causation requirement with mere common knowledge, and the plaintiff

---

[45]Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme Court of the United States, dissented in Celotex, this sentence is widely understood to be an accurate statement of the law. See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

provided no expert testimony bolstering its arguments.  See 184 F. Supp. 3d at 1075, 1079.

Without the requisite evidence, the plaintiff, the Court determined, failed to prove "an essential

element of the nonmoving party's case," rendering "all other facts immaterial."  184 F. Supp. 3d

at 1075 (quoting Plustwik v. Voss of Nor. ASA, 2013 WL 1945082, at *1).

The party opposing a motion for summary judgment must "set forth specific facts showing

that there is a genuine issue for trial as to those dispositive matters for which it carries the burden

of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir.

1990). See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving

party may not rest on its pleadings but must set forth specific facts showing that there is a genuine

issue for trial as to those dispositive matters for which it carries the burden of proof."(internal

quotation marks omitted)).  Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely

disputed must support the assertion by . . . citing to particular parts of materials in the record,

including depositions, documents, electronically stored information, affidavits or declarations,

stipulations (including those made for purposes of the motion only), admissions, interrogatory

answers, or other materials." Fed. R. Civ. P. 56(c)(1).  It is not enough for the party opposing a

properly supported motion for summary judgment to "rest on mere allegations or denials of his

pleadings." Liberty Lobby, 477 U.S. at 256.  See Abercrombie v. City of Catoosa, 896 F.2d 1228,

1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a

properly supported summary judgment motion is made, the opposing party may not rest on the

allegations contained in his complaint, but must respond with specific facts showing the existence

of a genuine factual issue to be tried." (citation omitted)(internal quotation marks omitted)).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. CIV 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Liberty Lobby, 477 U.S. at 248). Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party. See Liberty Lobby, 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871); Vitkus v. Beatrice Co., 11 F.3d at 1539. "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." Liberty Lobby, 477 U.S. at 249 (citations omitted). Where a rational trier of fact, considering the record as a whole, cannot find for the nonmoving party, there is no genuine issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain principles. First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial. See Liberty Lobby, 477 U.S. at 249. Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." Liberty Lobby, 477 U.S. at 254. Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor, and construe all evidence in the light most favorable to the nonmoving party. See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Liberty Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). Fourth, the court cannot decide any issues of credibility. See Liberty Lobby, 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts. This doctrine developed most robustly in the qualified immunity arena. In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court of the United States concluded that summary judgment is appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts. 550 U.S. at 378-81. The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus[.] Co. v. Zenith Radio Corp., 475 U.S. [at] 586-587 . . . (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. [at] 247-248 . . . . When opposing parties tell two different

stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (emphasis in original).

The United States Court of Appeals for the Tenth Circuit applied this doctrine in Thomson

v. Salt Lake County, 584 F.3d 1304 (10th Cir. 2009), and explained:

[B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts." York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting Scott, 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (brackets omitted). "The Tenth Circuit, in Rhoads

v. Miller, [352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),] explained that the

blatant contradictions of the record must be supported by more than other witnesses'

testimony[.]"[46]    Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M.

2010)(Browning, J.)(citation omitted), aff'd, 499 F. App'x 771 (10th Cir. 2012).

---

[46]Rhoads v. Miller is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . [a]nd we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision." United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The

<u>**LAW REGARDING ASCERTAINING STATE LAW**</u>

Ascertaining state law under jurisdiction supplemental to a federal question implicates the same principles articulated following <u>Erie Railroad Co. v. Tompkins</u>, 304 U.S. 64 (1983)("<u>Erie</u>"). Under <u>Erie</u>, a federal district court sitting in diversity applies "state law with the objective of obtaining the result that would be reached in state court." <u>Butt v. Bank of Am., N.A.</u>, 477 F.3d 1171, 1179 (10th Cir. 2007). <u>Accord</u> <u>Mem. Hosp. v. Healthcare Realty Trust Inc.</u>, 509 F.3d 1225, 1229 (10th Cir. 2007). The Court has held that if a district court exercising diversity jurisdiction cannot find a Supreme Court of New Mexico "opinion that [governs] a particular area of substantive law . . . [the district court] must . . . predict how the Supreme Court of New Mexico would [rule]." <u>Guidance Endodontics, LLC v. Dentsply Int'l., Inc.</u>, 708 F. Supp. 2d 1209, 1224-25 (D.N.M. 2010)(Browning, J.). "Just as a court engaging in statutory interpretation must always begin with the statute's text, a court formulating an <u>Erie</u> prediction should look first to the words of the state supreme court." <u>Peña v. Greffet</u>, 110 F. Supp. 3d 1103, 1132 (D.N.M. 2015)(Browning, J.).[47] If the Court finds only an opinion from the Court of Appeals of New

_____

Court finds that <u>Rhoads v. Miller</u> has persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion.

[47]In performing its <u>Erie</u>-mandated duty to predict what a state supreme court would do if faced with a case, <u>see</u> <u>Comm'r v. Estate of Bosch</u>, 387 U.S. 456 (1987), a federal court may sometimes contradict the state supreme court's own precedent if the federal court concludes that the state supreme court would, given the opportunity, overrule its earlier holding, <u>see</u> <u>Anderson Living Tr. v. WPX Energy Prod., LLC</u>, 27 F. Supp. 3d 1188, 1247 n.30 (2014)(Browning, J.). Courts should, obviously, be reticent to formulate an <u>Erie</u> prediction that conflicts with state-court precedent; even if the prediction turns out to be correct, such predictions produce disparate results between cases filed in state and federal courts, as the old state supreme court precedent usually binds state trial courts. The factors to which a federal court should look before making an <u>Erie</u> prediction that a state supreme court will overrule its prior precedent vary depending upon the case, but some consistent ones include: (i) the age of the state supreme court decision from which the federal court is considering departing -- the younger the state case is, the less likely it is that

Mexico, while "certainly [the Court] may and will consider the Court of Appeal[s'] decision in making its determination, the Court is not bound by the Court of Appeal[s'] decision in the same way that it would be bound by a Supreme Court decision." Mosley v. Titus, 762 F. Supp. 2d 1298, 1332 (D.N.M. 2010)(Browning, J.)(noting that, where the only opinion on point is "from the Court of Appeals, . . . the Court's task, as a federal district court sitting in this district, is to predict what the Supreme Court of New Mexico would do if the case were presented to it")(citing Wade v. EMCASCO Ins. Co., 483 F.3d 657, 666 (10th Cir. 2007)(explaining that, "[w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do," and that, "[i]n doing so, it may seek guidance from decisions rendered by lower courts in the relevant state")).[48]  The Court may also rely on Tenth Circuit decisions interpreting New Mexico

---

departure is warranted; (ii) the amount of doctrinal reliance that the state courts -- especially the state supreme court -- have placed on the state decision from which the federal court is considering departing; (iii) apparent shifts away from the doctrine that the state decision articulates, especially if the state supreme court has explicitly called an older case's holding into question; (iv) changes in the composition of the state supreme court, especially if mostly dissenting justices from the earlier state decision remain on the court; and (v) the decision's patent illogic or its inapplicability to modern times.  See Peña v. Greffet, 110 F. Supp. 3d 1103, 1132 n.17 (D.N.M. 2015)(Browning, J.).  In short, a state supreme court case that a federal court Erie predicts will be overruled is likely to be very old, neglected by subsequent state-court cases -- perhaps because it is in a dusty corner of the common law which does not get much attention or have much application -- and clearly wrong.

[48]The Supreme Court has addressed what the federal courts may use when there is not a decision on point from the state's highest court:

The highest state court is the final authority on state law, but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State.  An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question.  We have declared that principle in *West v. American Telephone and Telegraph Co.*, 311 U.S. 223 (1940), decided this day.  It is true that in that

law.  See Anderson Living Tr. v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1243 & n.30

(D.N.M. 2014)(Browning, J.).[49]  Ultimately, "the Court's task is to predict what the state supreme

case an intermediate appellate court of the State had determined the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.

. . . We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court, and we think that the decisions of the Court of Chancery [the New Jersey trial court] are entitled to like respect as announcing the law of the State.

. . . .

The question has practical aspects of great importance in the proper administration of justice in the federal courts.  It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship.  In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts] appears to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

Fid. Union Trust Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes and citations omitted).  The Supreme Court has softened this position over the years; federal courts are no longer bound by state trial or intermediate court opinions, but "should attribute [them] some weight . . . where the highest court of the State has not spoken on the point."  Comm'r v. Estate of Bosch, 387 U.S. at 465 (citing King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)).  See 17A James Wm. Moore et al., Moore's Federal Practice § 124.20 (3d ed. 1999)("Moore's")("Decisions of intermediate state appellate courts usually must be followed . . . [and] federal courts should give some weight to state trial courts decisions."(emphasis and title case omitted)).

[49]In determining the proper weight to accord Tenth Circuit precedent interpreting New Mexico law, the Court must balance the need for uniformity between federal court and state court interpretations of state law with the need for uniformity among federal judges.  If the Court adheres too rigidly to Tenth Circuit case law, ignoring changes undergone by a state's law in the ensuing years, then parties litigating state-law claims will be subject to a different body of substantive law, depending on whether they litigate in state court or federal court.  This result frustrates the purpose of Erie, which held that federal courts must apply state court interpretations of state law, rather

than their own, in part so that parties achieve a consistent result regardless of the forum. This consideration pulls the Court toward according Tenth Circuit precedent less weight and according state court decisions issued in the ensuing years more weight. On the other hand, when the state law is unclear, it is desirable for there to at least be uniformity among federal judges as to its proper interpretation. Otherwise, different federal judges within the same circuit -- or even the same district, as district courts' decisions are not binding, even upon themselves -- would be free to adopt differing interpretations of a state's law. This consideration pulls the Court towards a stronger respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless whether it accurately reflects state law -- at least provides consistency at the federal level, so long as federal district judges are required to follow it.

The Court must decide how to weigh Tenth Circuit case law against more-recent state court decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to Tenth Circuit precedent unless there is intervening case law directly on point from the state's highest court, on one end; and independently interpreting the state law, regarding the Tenth Circuit precedent as no more than persuasive authority, on the other. In striking this balance, the Court notes that it is generally more concerned about systemic inconsistency between the federal courts and the state courts than it is about inconsistency among federal judges. Judges, even those within a jurisdiction with ostensibly identical governing law, sometimes interpret and apply the law differently from one another; this inconsistency is part and parcel of a common-law judicial system. More importantly, litigants seeking to use forum selection to gain a substantive legal advantage cannot easily manipulate such inconsistency: cases are assigned randomly to district judges in this and many federal districts; and, regardless, litigants cannot know for certain how a given judge will interpret the state law, even if they could determine the identity of the judge pre-filing or pre-removal. All litigants know in advance is that whomever federal district judge they are assigned will look to the entirety of the state's common law in making his or her determination -- the same as a state judge would. Systemic inconsistency between the federal courts and state courts, on the other hand, not only threatens the principles of federalism, but litigants may more easily manipulate the inconsistency. When the Tenth Circuit issues an opinion interpreting state law, and the state courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the state forum, or vice versa.

The Court further notes that district courts may be in a better position than the Tenth Circuit to be responsive to changes in state law. Tenth Circuit decisions interpreting a particular state's law on a specific issue are further apart in time than the collective district courts' decisions are. More importantly, the Tenth Circuit does not typically address such issues with the frequency that the state's courts themselves do. Accordingly, Tenth Circuit precedent can lag behind state law developments -- developments that the district courts may be nimble enough to perceive and adopt. Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular state's law is wasted. Other than Oklahoma, every state encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look. Last, the Court notes, respectfully, that district courts may be in a better position than the Tenth Circuit to develop expertise on the state law of the state in which they sit. Every federal judicial

district in the nation, except the District of Wyoming, covers at most one state. It is perhaps a more workable design for each district court to keep track of legal developments in the state law of its own state(s) than it is for the Tenth Circuit to monitor separate legal developments in eight states. The Tenth Circuit used to follow this rationale in applying a clearly erroneous standard of review to district judge decisions of state law with no controlling state Supreme Court precedent. See Weiss v. United States, 787 F.2d 518, 525 (10th Cir. 1986); Rawson v. Sears, Roebuck, & Co., 822 F.2d 908, 923 (10th Cir. 1987)(McKay, J., dissenting)(collecting cases). Since the mid-1980s, however, the Tenth Circuit has abandoned that rationale and applied a de novo standard of review to district judge decisions applying state law with no governing state Supreme Court precedent. See Rawson v. Sears, Roebuck, & Co., 822 F.2d at 908. See also id. at 923 (McKay, J., dissenting)(noting that the majority had abandoned the "sanctified" clearly erroneous standard or, the "so-called local-judge rule" in its analysis). The Court regrets the Tenth Circuit's retreat from the clearly erroneous standard.

Having outlined the relevant considerations, the Court thinks the proper stance on vertical stare decisis in the context of federal court interpretations of state law is as follows: the Tenth Circuit's cases are binding as to their precise holding -- what the state law was on the day the opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the Constitution of the United States of America possess. A district court considering a state law issue after the publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based only on state court cases available to and considered by the Tenth Circuit, but it may come to such a conclusion based on intervening state court cases.

When interpreting state law, the Tenth Circuit does not and cannot issue a case holding that x is the law in New Mexico; it holds that the proper interpretation of New Mexico law, at the time the opinion is released, is x. Its holdings are descriptive, not prescriptive -- interpretive, not normative. Because federal judicial opinions lack independent substantive force on state law issues, but possess such force regarding federal law issues, the Court thinks the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting state law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law. The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing body of law was accurate. The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to independently consider the whole body of state law that exists when the time comes that diversity litigants raise the issue in their courtrooms. Giving such effect to the Tenth Circuit's interpretations of state law is at tension with Erie, giving independent substantive effect to federal judicial decisions -- i.e., applying federal law -- in a case brought in diversity.

The purpose of Erie is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or state forum. For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the states' highest court would rule if confronted with the issue." Moore's § 124.22[3] (citing Comm'r v. Estate of Bosch, 387 U.S.

at 465 ("[A]n intermediate appellate state court [decision] is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise."(citation and internal quotation marks omitted)). This statement may not be the most precise formulation if the goal is to ensure identical outcomes in state and federal court -- the Honorable Milton I. Shadur, United States District Judge for the Northern District of Illinois, looks to state procedural rules to determine in which state appellate circuit the suit would have been filed were it not in federal court, and then applies the state law as that circuit court interprets it, see Abbott Laboratories v. Granite State Ins. Co., 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(noting that the approach of predicting the state supreme court's holdings will often lead to litigants obtaining a different result in federal court than they would in state court, where only the law of the circuit in which they filed -- and certainly not nonexistent, speculative state supreme court law -- governs) -- but it is a workable solution that has achieved consensus. See Allstate Ins. Co. v. Menards, Inc., 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question."). This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to consider state appellate and trial court decisions. To the contrary, even non-judicial writings by influential authors, statements by state supreme court justices, the closeness of the vote on a prior case addressing the issue, and personnel changes on the court -- considerations that would never inform a federal court's analysis of federal law -- may validly come into play. The question is whether the district courts must abdicate, across-the-board, the "would decide" aspect of the Erie analysis to their parent appellate courts when the Court of Appeals has declared an interpretation of state law.

The Erie doctrine results in federal cases that interpret state law withering with time. While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption), expanding outward from the general (states must grant criminal jury trials) to the specific (the jury need not be twelve people, nor must it be unanimous) -- federal cases interpreting state law often become stale. New state court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone. The Supreme Court, which picks its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of state law.

The Court's views on Erie, of course, mean little if the Tenth Circuit does not agree. In Wankier v. Crown Equipment Corp., the Tenth Circuit said that,

> [w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. In performing this ventriloquial function, however, the federal court is bound by ordinary principles of *stare decisis*. Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved

<u>Wankier v. Crown Equip. Corp.</u>, 353 F.3d 862, 866 (10th Cir. 2003)(McConnell, J.). From this passage, it seems clear the Tenth Circuit permits a district court to deviate from its view of state law only on the basis of a subsequent case "of the state's highest court." <u>The American Heritage Dictionary of the English Language</u> 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that"). A more aggressive reading of the passage -- namely the requirement that the intervening case "resolv[e] the issue" -- might additionally compel the determination that any intervening case law must definitively and directly contradict the Tenth Circuit interpretation in order to be considered "intervening."

It is difficult to know whether Judge McConnell's limitation of "intervening decision" to cases from the highest state court was an oversight or intentional. Most of the Tenth Circuit's previous formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts. Even <u>Koch v. Koch Industries, Inc.</u>, 203 F.3d 1202, 1231 (10th Cir. 2000), the primary authority upon which <u>Wankier v. Crown Equipment Corp.</u> relies, uses the more inclusive definition. In fact, <u>Wankier v. Crown Equipment Corp.</u> quotes its relevant passage:

> In the absence of intervening Utah authority indicating that a plaintiff is not required to prove a safer, feasible alternative design, we are bound to follow the rule of <em>Allen</em> [<u>v. Minnstar, Inc.</u>, 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case interpreting an issue of Utah law], as was the district court. "Following the doctrine of stare decisis, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or an intervening change in the state's law." <u>Koch v. Koch Indus., Inc.</u>, 203 F.3d at 1231.

<u>Wankier v. Crown Equip. Corp.</u>, 353 F.3d at 867.

Regardless whether the decision to limit the intervening authority a district court can consider was intentional or not, the Tenth Circuit has picked it up and run with it. In <u>Kokins v. Teleflex, Inc.</u>, the Tenth Circuit, quoting <u>Wankier v. Crown Equipment Corp.</u>, refused to consider an opinion from the Court of Appeals of Colorado holding directly the opposite of an earlier Tenth Circuit interpretation of Colorado law. <u>See Kokins v. Teleflex, Inc.</u>, 621 F.3d 1290, 1297 (10th Cir. 2010)(Holmes, J.)("[T]he Colorado Court of Appeals decided <em>Biosera</em>[, <u>Inc. v. Forma Scientific, Inc.</u>, 941 P.2d 284 (Colo. Ct. App. 1998)], so it is not an 'intervening decision of the state's <em>highest court</em>.'"(emphasis in original)(quoting <u>Wankier v. Crown Equip. Corp.</u>, 353 F.3d at 866)).

The Tenth Circuit has set forth a stringent restriction on its district courts' ability to independently administer the <u>Erie</u> doctrine. More importantly, the Tenth Circuit's view may be at tension with the above-quoted Supreme Court precedent, as well as its own prior case law. <u>Moore's</u> lists the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior federal appellate decision [interpreting state law] is persuasive." <u>Moore's</u> § 124.22[4] (citing <u>State</u>

court would do." Wade v. EMCASCO Ins. Co., 483 F.3d at 666. Accord Mosley v. Titus, 762

F. Supp. 2d at 1332 (citation omitted); Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d 1174, 1188-89

(D.N.M. 2008)(Browning, J.)(quoting Wade v. EMCASCO Ins. Co., 483 F.3d at 665-66).

## LAW REGARDING THE FLSA

The FLSA requires covered employers to pay a minimum wage, and to pay their

nonexempt employees overtime pay of time and one half their regular rate of pay for hours worked

in excess of forty in a work week. See 29 U.S.C. §§ 206-207. The FLSA provides five means of

enforcement: (i) criminal prosecutions for willful violators, see 29 U.S.C. § 216(a); (ii) individual

civil causes of action to recover unpaid minimum wages, overtime compensation and certain

liquidated damages, see 29 U.S.C. § 216(b); (iii) collective actions to recover damages, which are

basically opt-in class actions, see 29 U.S.C. § 216(b); (iv) a cause of action allowing the Secretary

of the Department of Labor to recover employees' damages and for additional recovery of "an

equal amount of liquidated damages," 29 U.S.C. § 216(c); and (v) a suit for injunctive relief, see

29 U.S.C. § 217. "The principal congressional purpose in enacting the Fair Labor Standards Act

of 1938 was to protect all covered workers from substandard wages and oppressive working hours,

'labor conditions [that are] detrimental to the maintenance of the minimum standard of living

necessary for health, efficiency and general well-being of workers.'" Barrentine v. Arkansas-Best

Freight Sys., Inc., 450 U.S. 728, 739 (1981)(alterations in original)(quoting 29 U.S.C. § 202(a)).

1.      **Employers Under the FLSA.**

The FLSA defines "employer" broadly:

---

Farm Mut. Auto. Ins. Co. v. Travelers Indem. Co., 433 F.2d 311, 312 (10th Cir. 1970)). Still, the
Court is bound to abide by the Tenth Circuit's interpretation of Erie.

"Employer" includes any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency, but does not include any labor organization (other than when acting as an employer) or anyone acting in the capacity of officer or agent of such labor organization.

29 U.S.C. § 203. "Whether an employment relationship exists for the purposes of the FLSA turns on the 'economic reality' of the working relationship." Saavedra v. Lowe's Home Ctrs., Inc., 748 F. Supp. 2d 1273, 1285 (D.N.M. 2010)(Browning, J.)(quoting Goldberg v. Whitaker House Co-op., Inc., 366 U.S. 28, 33 (1961)). The Supreme Court has instructed courts to construe the terms "employer" and "employee" expansively under the FLSA. Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 326 (1992). See Rutherford Food Corp. v. McComb, 331 U.S. 722, 730 (1947)("[T]here is in the [FLSA] no definition that solves problems as to the limits of the employer-employee relationship under the Act . . . . The definition of 'employ' is broad."). The Tenth Circuit has similarly recognized that "[t]he terms 'employ' and 'employer' are given . . . broad . . . definitions." Johnson v. Unified Gov't of Wyandotte Cnty., 371 F.3d 723, 729 (10th Cir. 2004)(Holloway, J.).

> The statute is a remedial one, written in the broadest possible terms . . . . It runs counter to the breadth of the statute and to the Congressional intent to impose a qualification which permits an employer who exercises substantial control over a worker, but whose hiring decisions occasionally may be subjected to a third party's veto, to escape compliance with the Act.

Carter v. Dutchess Cmty. Coll., 735 F.2d 8, 12 (2d Cir. 1984). "Employer" includes persons or entities who have "managerial responsibilities" that give the person or entity "substantial control of the terms and conditions of the work of [its] employees." Falk v. Brennan, 414 U.S. 190, 195 (1973). "Corporate officers who have a substantial ownership interest in the corporation, and who are directly involved in decisions affecting employee compensation, may be held personally liable under the FLSA." Saavedra v. Lowe's Home Ctrs., Inc., 748 F. Supp. 2d at 1288 (citing Donovan

v. Agnew, 712 F.2d 1509, 1511 (1st Cir. 1983)). See Fegley v. Higgins, 19 F.3d 1126, 1131 (6th Cir. 1994); Reich v. Circle C Invs. Inc., 998 F.2d 324, 329 (5th Cir. 1993); Donovan v. Grim Hotel Co., 747 F.2d 966, 972 (5th Cir. 1984); Donovan v. Janitorial Servs., Inc., 672 F.2d 530, 531 (5th Cir. 1982); Shultz v. Mack Farland & Sons Roofing Co., 413 F.2d 1296, 1300 (5th Cir. 1969).

## 2. **The FLSA's Minimum Wage, Overtime, and Records Requirements.**

FLSA § 7 requires employers to pay covered employees who, in a given workweek, work more than forty hours "at a rate not less than one and one-half times the regular rate at which [the employee] is employed." 29 U.S.C. § 207(a)(1). "The purpose of FLSA overtime is 'to compensate those who labored in excess of the statutory maximum number of hours for the wear and tear of extra work and to spread employment through inducing employers to shorten hours because of the pressure of extra cost.'" Chavez v. City of Albuquerque, 630 F.3d 1300, 1304 (10th Cir. 2011)(Briscoe, J.). The Tenth Circuit has recognized "that a contract cannot designate an artificially low regular rate in order to reduce the minimum statutory overtime due . . . , [as] parties cannot avoid the purposes of the FLSA by designating a fictitious regular rate." Chavez v. City of Albuquerque, 630 F.3d at 1305 (citing Walling v. Wall Wire Prods. Co., 161 F.2d 470, 473 (6th Cir. 1947)).

> Much like the protections that the United States Constitution provides to United States citizens, the Court sees the FLSA as a minimum standard. Employers are not allowed to provide their employees less protection . . . than the Act provides. If the employer wishes, however, it may provide its employees more protections than the Act dictates.

Rodriguez v. City of Albuquerque, 687 F. Supp. 2d 1270, 1309 (D.N.M. 2009)(Browning, J.), aff'd in part, rev'd in part and remanded, 420 F. App'x 845 (10th Cir. 2011).

Under the FLSA, an employer must pay its employees for the time that it "employ[s]" them, the statutory definition of which means "to suffer or permit to work." 29 U.S.C. § 203(g). See 29 C.F.R. § 785.6 ("By statutory definition the term 'employ' includes (section 3(g)) 'to suffer or permit to work.' The act, however, contains no definition of 'work.'"). "The test for whether an employee's time constitutes working time is whether the time is spent predominantly for the employer's benefit or for the employee's." United Transp. Union Local 1745 v. City of Albuquerque, 178 F.3d 1109, 1116 (10th Cir. 1999)(internal quotation marks omitted)(quoting Gilligan v. City of Emporia, 986 F.2d 410, 412 (10th Cir. 1993)). The Supreme Court has rejected the argument that Congress' intent in enacting the FLSA was to compensate employees "for all actual work . . . as those words are commonly used -- as meaning physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." Armour & Co. v. Wantock, 323 U.S. 126, 132 (1944)(quoting Tenn. Coal, Iron & R.R. v. Muscoda Local No. 123, 321 U.S. 590, 597 (1944)). The Supreme Court explained:

> [A]n employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen. Refraining from other activity often is a factor of instant readiness to serve, and idleness plays a part in all employments in a stand-by capacity. Readiness to serve may be hired, quite as much as service itself, and time spent lying in wait for threats to the safety of the employer's property may be treated by the parties as a benefit to the employer. Whether time is spent predominantly for the employer's benefit or for the employee's is a question dependent upon all the circumstances of the case.

Armour & Co. v. Wantock, 323 U.S. at 133.

FLSA § 6 requires employers to pay their employees a minimum wage. See 29 U.S.C. § 206(a). Deductions from employees' paychecks, for whatever reason, that bring the employees' pay under the minimum wage violate § 6. See Donovan v. Simmons Petrol. Corp., 725 F.2d 83,

84 (10th Cir. 1983)(holding that the employer's deductions of "cash register shortages and the amount of uncollectible checks accepted by its employees from the paychecks of employees who were on duty when the shortages occurred" was a willful FLSA violation). Cf. Dole v. Solid Waste Servs., Inc., 733 F. Supp. 895, 924 (E.D. Pa. 1989)(Huyett, J.)(concluding that deductions "for lunch breaks during which [employees were] required to continue with any duties relating to . . . work," bringing employees below minimum wage, violated the FLSA). Further, FLSA § 11 imposes on an employer a duty to "make, keep, and preserve" records of its employees' wages, hours, and "other conditions and practices of employment" that the employer may maintain. 29 U.S.C. § 211(c). In Donovan v. Simmons Petroleum Corporation, the Tenth Circuit recognized the employers' duty under the FLSA to keep accurate records in discussing the shift of the burden to prove damages between the employee and the employer:

> The employee bears the burden of proving he performed work for which he was not properly compensated. Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687 (1946). However, employers have a duty to keep accurate records. If employers do not keep accurate records the employee's burden is extremely difficult. In order to prevent the employee from being penalized by the employer's failure to keep adequate records, the Supreme Court held in Anderson that an employee carries his burden by proving that he has "in fact performed work for which he was improperly compensated and . . . [producing] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." Id. Upon such a showing, the burden shifts to the employer to produce evidence of the precise amount of work performed or to negate the reasonableness of the inference drawn from the employee's evidence. If the employer does not rebut the employee's evidence, then damages may be awarded even though the result is only approximate. The employer cannot complain that the damages lack the precision that would have been possible if the employer had kept the records required by law. Id. at 687-88.

Donovan v. Simmons Petrol. Corp., 725 F.2d at 85-86. The federal Department of Labor's Wage and Hour Division requires that employers must maintain in their records the time of day and day of the week on which the employee's workweek begins, the regularly hourly pay rate for the

employee in any week in which overtime compensation is due, the hours worked each workday and workweek, the total daily or weekly straight-time earned, and the total overtime. See 29 C.F.R. § 516.2(a). Where an employer violates its § 211(c) record-keeping duties, including by not counting time worked before and after an employee's shift begins, the employer cannot meet its burden to rebut the Labor and Wage investigators' reasonable estimates of backpay due to the employees. See Metzler v. IBP, Inc., 127 F.3d 959, 965-66 (10th Cir. 1997)("When the employer has failed to record compensable time . . . , [t]he employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with the requirements of [29 U.S.C. § 211(c) ]."); U.S. Dep't of Labor v. Cole Enters., Inc., 62 F.3d 775, 781 (6th Cir. 1995)("We agree with the district court's conclusion that the calculations of the investigator are a reasonable and generous estimate of the back wages due to the Defendants' employees for the pre-shift and postshift hours worked.").

Section 7(a) sets forth the general rule for calculating overtime. See 29 U.S.C. § 207(a)(1). Because the FLSA does not put a limit "on the number of hours that an employee may work in any workweek, he may work as many hours a week as he and his employer see fit, [but, the employer must pay] the required overtime compensation . . . for hours worked in excess of the maximum workweek prescribed by section 7(a)." 29 C.F.R. § 778.102. The statute states:

> Except as otherwise provided in this section, no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1). See 29 C.F.R. § 778.107 ("The general overtime pay standard in section 7(a) requires that overtime must be compensated at a rate not less than one and one-half times the

regular rate at which the employee is actually employed."). The statute's language demands that an employee receive one and one-half times the "regular rate" of pay for hours that he or she works in excess of forty in a given week. 29 U.S.C. § 207(a)(1).

One important principle is that FLSA overtime is based on the number of hours worked in a particular workweek.

> The Act does not . . . require . . . that an employee be paid overtime compensation for hours in excess of eight per day, or for work on Saturdays, Sundays, holidays or regular days of rest. If not more than the maximum hours prescribed in the Act are actually worked in the workweek, overtime pursuant to section 7(a) need not be paid.

29 C.F.R. § 778.102. On the other hand, that the FLSA does not require that the employer pay overtime for those hours does not relieve an employer from paying overtime for them if the contract of employment demands them. See 29 C.F.R. § 778.102.

For purposes of calculating overtime under the FLSA, however, the only concern is whether the total hours worked in a given workweek are above or below the statutory requirement for overtime compensation. See 29 C.F.R. § 778.102. A second important principle about calculating overtime under the FLSA is that the employee must receive overtime pay at a rate of no less than one and one-half times the "regular rate" for which the employer employs the employee. Walling v. Youngerman-Reynolds Hardwood Co., 325 U.S. 419, 424 (1945)("The keystone of Section 7(a) is the regular rate of compensation."). The Supreme Court described "the regular rate" as "the hourly rate actually paid the employee for the normal, non-overtime workweek for which he is employed." Walling v. Youngerman-Reynolds Hardwood Co., 325 U.S. at 424. Since the Supreme Court's opinion in Walling v. Youngerman-Reynolds Hardwood Co., Congress has amended the FLSA to include a description of regular rate, see 29 U.S.C.

§ 207(e) (stating that "the 'regular rate' at which an employee is employed shall be deemed to include all remuneration for employment paid to, or on behalf of, the employee," with eight statutory exceptions),[50] and the interpretive bulletins have incorporated the Supreme Court's definition, see 29 C.F.R. § 778.108 ("The Supreme Court has described it as the hourly rate actually paid the employee for the normal, nonovertime workweek for which he is employed -- an 'actual fact.'").  Generally, the exceptions include overtime pay and compensation that is discretionary on the employer's part.  See 29 C.F.R. § 779.108.

### 3.    Compensable Time Under the FLSA.

Congress enacted the Portal-to-Portal Act of 1947, 29 U.S.C. §§ 251-262, to define certain activities for which employers need not compensate pursuant to the FLSA.[51]  The Portal-to-Portal

---

[50]The FLSA now contains a description of what is included in the regular rate, but still contains no definition precisely setting forth how it is calculated.  See Scott v. City of N.Y., 592 F. Supp. 2d 475, 482 (S.D.N.Y. 2008)(Scheindlin, J.)("The words 'regular rate' are not defined in the Act." (quoting Walling v. Helmerich & Payne, Inc., 323 U.S. 37, 40 (1944))(internal quotation marks omitted)).

[51]The Portal-to-Portal Act provides:

> [N]o employer shall be subject to any liability or punishment under the Fair Labor Standards Act of 1938, as amended, . . . on account of the failure of such employer to pay an employee minimum wages, or to pay an employee overtime compensation, for or on account of any of the following activities of such employee . . . --

> (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and

> (2) activities which are preliminary to or postliminary to said principal activity or activities, which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

29 U.S.C. § 254(a)(emphasis added).

Act excludes from compensation certain preliminary and postliminary activities, like pre-shift walking and, in some cases, changing clothes and putting on specific gear. See Steiner v. Mitchell, 350 U.S. 247, 252 (1956); Reich v. IBP, Inc., 38 F.3d at 1126 (holding that the donning and doffing of safety glasses, ear plugs, a hard hat, and safety shoes are non-compensable preliminary and postliminary activities). Under Department of Labor regulations explaining the Portal-to-Portal Act, see 29 C.F.R. § 790.6, the workday begins with the "first principal activity" and ends with the last, IBP, Inc. v. Alvarez, 546 U.S. 21, 34 (2005)(quoting Steiner v. Mitchell, 350 U.S. at 256).

The Supreme Court clarified what constitutes a "principal activity" in IBP, Inc. v. Alvarez, 546 U.S. at 34. It held that anything that is "integral and indispensable" to a "principal activity" is itself a "principal activity" under the Portal-to-Portal Act, which makes it compensable. 546 U.S. at 37. The Supreme Court noted that, to the extent that standard protective clothing and gear are "integral and indispensable" to a principal activity, the donning and doffing of those items are principal activities and are therefore compensable. 546 U.S. at 36-37. Accordingly, the key issue to determining compensability is whether the pre-shift activities are integral and indispensable to the employee's principal activities. See Lindow v. United States, 738 F.2d 1057, 1060 (9th Cir. 1984)(Choy, J.)(concluding that pre-shift activities may be compensable if they are an "integral and indispensable" part of the principal activities).

The Tenth Circuit has interpreted what constitutes preliminary, non-compensable activities. In Smith v. Aztec Well Servicing Co., 462 F.3d 1274 (10th Cir. 2006), the plaintiffs argued that they were entitled to compensation for time spent loading their trucks with safety and protective gear, then traveling to the job site. See 462 F.3d at 1276-77. The Tenth Circuit acknowledged that, if the plaintiffs' first principal activity -- loading their trucks with protective

gear -- occurred before traveling to the job site, then the plaintiffs' travel time constituted compensable work. 462 F.3d at 1289. Nonetheless, the Tenth Circuit explained that, where

> an employee's activity "takes all of a few seconds and requires little or no concentration," then the activity is "properly considered not work at all." Moreover, "[r]equiring employees to show up at their work stations with such standard equipment [as a hard hat, safety glasses, earplugs, and safety shoes] is no different from having a baseball player show up in uniform, . . . or a judge with a robe." It is simply a prerequisite for the job, and is purely preliminary in nature. Consequently, the plaintiffs' travel to and from the well sites was not integral and indispensable to their principal activities merely because they were required to carry their personal safety equipment along with them.

462 F.3d at 1289 (quoting Reich v. IBP, Inc., 38 F.3d at 1125, 1126 n.1). In arriving at its decision that loading protective gear into the truck was not integral and indispensable to the plaintiffs' job, the Tenth Circuit considered the amount of time it took and the level of concentration. See Smith v. Aztec Well Servicing Co., 462 F.3d at 1290-91. The safety equipment was clearly required to do the job, yet the Tenth Circuit still found that it was not integral and indispensable to the employees' principal activities. Similarly, in Reich v. IBP, Inc., the Tenth Circuit held that putting on safety glasses, ear plugs, a hard hat, and safety shoes was not compensable, because it "requires little or no concentration," and can easily be done while focusing on other things. 38 F.3d at 1126. "Thus, although essential to the job, and required by the employer, any time spent on these items is not work." 38 F.3d at 1126. In contrast, putting on special protective gear that was "heavy and cumbersome," and required "physical exertion, time, and a modicum of concentration to put them on securely and properly," was compensable, as this donning differed in kind rather than merely degree. 38 F.3d at 1126.

Because mandatory pre-shift briefings may be integral and indispensable to an employee's principal activities, they may form the basis of an FLSA overtime violation. That "certain preshift

activities are necessary for employees to engage in their principal activities does not mean that those preshift activities are 'integral and indispensable,'" however.  IBP, Inc. v. Alvarez, 546 U.S. at 40.  An activity is integral and indispensable if it is an "intrinsic element" of the employee's principal activities, and one with which the employee cannot dispense if he or she is to perform his or her principal activities.  See Integrity Staffing Solutions, Inc. v. Busk, 135 S. Ct. 513, 514 (2014).  Consequently, the Supreme Court has held that time spent waiting to don protective gear is not compensable, while time spent sharpening knives at a meatpacking plant is compensable, as dull knives would slow the assembly line production, cause waste, lead to accidents, and "affect the appearance of the meat as well as the quality."  Integrity Staffing Solutions, Inc. v. Busk, 135 S. Ct. at 518 (quoting Mitchell v. King Packing Co., 350 U.S. 260, 262 (1956)).  In other words, the employees could not perform their jobs adequately without sharpening their knives.  See Integrity Staffing Solutions, Inc. v. Busk, 135 S. Ct. at 514.

Recently, the Supreme Court held that time spent undergoing mandatory security screenings were not compensable.  See Integrity Staffing Solutions, Inc. v. Busk, 135 S. Ct. at 518. The Supreme Court stated that, although the employer required employees to undergo the screenings, the screenings were not integral and indispensable to the principal task which they were paid to perform -- stocking warehouse shelves and packaging products.  See 135 S. Ct. at 519.  Importantly, the Supreme Court stated that the United States Court of Appeals for the Ninth Circuit "erred by focusing on whether an employer *required* a particular activity.  The integral and indispensable test is tied to the productive work that the employee is *employed to perform*." 135 S. Ct. at 519 (emphasis in original).  Moreover, the Supreme Court held that it was not determinative whether the task benefitted the employer.  See 135 S. Ct. at 519.

> [I]t is not enough to make an activity compensable under the Fair Labor Standards Act that the employer requires it and it is done for the benefit of the employer. Even activities required by the employer and for the employer's benefit are "preliminary" or "postliminary" if not integral and indispensable to "the productive work that the employee is *employed to perform*."

Balestrieri v. Menlo Park Fire Prot. Dist., 800 F.3d 1094, 1101 (9th Cir. 2015)(Kleinfeld, J.)(emphasis in original)(quoting Integrity Staffing Solutions, Inc. v. Busk, 135 S. Ct. at 519).

Finally, the Supreme Court reaffirmed its statement that, if the employee need not perform a task before every shift or the task can be eliminated altogether, it is not integral and indispensable. See Integrity Staffing Solutions, Inc. v. Busk, 135 S. Ct. at 513 (finding that an activity was not integral and indispensable when the employees did not participate in them every day); id. at 518 (finding that activities were not integral and indispensable if the employer could have eliminated the required practice without impairing the employees' ability to complete their work). Unlike activities that are "*always* essential if the worker is to do his job," certain activities "may or may not be necessary in particular situations or for every employee." IBP, Inc. v. Alvarez, 546 U.S. at 40. When certain tasks are not necessary, the activity "comfortably qualif[ies] as a 'preliminary' activity." IBP, Inc. v. Alvarez, 546 U.S. at 40.

### 4.     The FLSA's Remedies.

Actions to enforce the FLSA's overtime provisions are generally subject to a two-year statute of limitations unless the violation is willful, in which case the limitations period is three years. See 29 U.S.C. § 255(a). A lawsuit to enforce a cause of action for unpaid minimum wages, unpaid overtime compensation, or liquidated damages

> may be commenced within two years after the cause of action accrued, and every such action shall be forever barred unless commenced within two years after the

cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued . . . .

29 U.S.C. § 255(a). Willful violations occur when "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA]." McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988)(citing Trans World Airlines, Inc. v. Thurston, 469 U.S. 111 (1985)).

Beyond the actual damages to cover the amount of unpaid minimum wages or overtime compensation, FLSA § 16(c) allows additional recovery of "an equal amount of liquidated damages." 29 U.S.C. § 216(c). The Tenth Circuit has noted: "The purpose for the award of liquidated damages is 'the reality that the retention of a workman's pay may well result in damages too obscure and difficult of proof for estimate other than by liquidated damages.'" Renfro v. Emporia, 948 F.2d 1529, 1540 (10th Cir. 1991)(quoting Laffey v. Nw. Airlines, Inc., 567 F.2d 429, 463 (D.C. Cir. 1976)). If the employer can show that the conduct giving rise to the action to recover back pay was in good faith, and that the employer had reasonable grounds to believe the conduct was lawful, the court may refuse to award some or all liquidated damages:

> Under 29 U.S.C. § 260, if in any action to recover unpaid overtime compensation an employer "shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the FLSA," the court may refuse to award liquidated damages.
>
> > All circuits that have considered the matter hold that the trial court may eliminate or reduce the award of liquidated damages only if the employer shows both that he acted in good faith and that he had reasonable grounds for believing that his actions did not violate the Act.

Renfro v. Emporia, 948 F.2d at 1540 (quoting Doty v. Elias, 733 F.2d 720, 725 (10th Cir. 1984)). The employer bears the burden to prove that the conduct was reasonable and in good faith. See Renfro v. Emporia, 948 F.2d at 1540. For purposes of assessing whether the employer meets its burden, "[t]he good faith requirement mandates the employer have 'an honest intention to ascertain and follow the dictates of the [FLSA]. The additional requirement that the employer have reasonable grounds for believing that his conduct complies with the Act imposes an objective standard by which to judge the employer's behavior.'" Renfro v. Emporia, 948 F.2d at 1540 (quoting Doty v. Elias, 733 F.2d at 725). See Garcia v. Tyson Foods, Inc., 890 F. Supp. 2d 1273, 1295 (D. Kan. 2012)(Marten, J.)("While the employer must prove subjective good faith, it must also prove that its actions were objectively reasonable. If the employer meets that burden the court retains discretion whether to award liquidated damages."(citations omitted)).

FLSA § 17 provides that district courts "shall have jurisdiction, for cause shown, to restrain [FLSA] violations . . . including . . . the restraint of any withholding of payment of minimum wages or overtime compensation found by the court to be due to employees under this chapter . . . ." 29 U.S.C. § 217(c). The question whether a court should grant an injunction is left to the court's sound discretion. See Mitchell v. Hertzke, 234 F.2d 183, 187 (10th Cir. 1956)("Although it is not clearly stated in these Labor Standards Act cases that the burden of proving the need for an injunction is upon the movant[,] that is a general principle of law and applies with legal force here."). "The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive. Current compliance alone, particularly when achieved by direct scrutiny of the government, is not sufficient ground for denying injunctive relief." Metzler v. IBP, Inc., 127 F.3d

at 963 (alterations and citations omitted)(quoting United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953), and citing Brock v. Big Bear Mkt. No. 3, 825 F.2d 1381, 1383 (9th Cir. 1987)). In exercising its discretion to grant a prospective injunction after finding a previous FLSA violation, "courts balance that finding against factors indicating a reasonable likelihood that the violation will not recur, such as the employer's intent to comply, extraordinary efforts taken to prevent recurrence, the absence of repetitive violations, and the absence of bad faith." Metzler v. IBP, Inc., 127 F.3d at 963-64 (citing Martin v. Coventry Fire Dist., 981 F.2d 1358, 1362 (1st Cir. 1992)).

## ANALYSIS

Summary judgment is appropriate under rule 56(c) of the Federal Rules of Civil Procedure if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In making this determination, the Court must construe all evidence in the light most favorable to the nonmoving party. See Hunt v. Cromartie, 526 U.S. at 550-55. See also Liberty Lobby, at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). In construing a FLSA exemption, the Court must conclude that the employer "plainly and unmistakably" falls within the exemption and so the Court will apply the same standard to the NMMWA. See Lederman v. Frontier Fire Prot., Inc., 685 F.3d at 1157-58 ("Our cases stand for the proposition that in considering an FLSA exemption, a court must find that the claimed exemption falls 'plainly and unmistakably' within the terms of the statute[.]"); Valentine v. Bank of Albuquerque, 1985-NMSC-033, ¶ 4, 697 P.2d 489, 490 (applying the FLSA definition of "administrative employee" to interpret the same phrase in the NMMWA); Lopez v. Singh, 1949-NMSC-022, ¶ 7, 205 P.2d 492, 493; Armijo v. Wal-Mart Stores, Inc., 2007-NMCA-120, ¶ 47, 168 P.3d at 144 (looking to cases construing the FLSA for

persuasive authority in interpreting an identical NMMWA provision); <u>Garcia v. Am. Furniture Co.</u>, 1984-NMCA-090, ¶ 13, 689 P.2d at 937.

Here, there is no genuine dispute as to any material facts -- the parties' briefings largely proffer their own facts, but do not genuinely dispute each other's facts. <u>See</u> MSJ ¶¶ 1-19, at 2-6 (listing "undisputed material facts"); MSJ Response at 1-9 (not discussing these facts). <u>See</u> <u>also</u> Cross Memo. ¶¶ 1-15, at 4-6 (listing "undisputed material facts"); Cross MSJ Response at 1-4 (listing "additional undisputed material facts" and responding to Corman's Facts 11-15, but not genuinely disputing those facts); Cross MSJ Reply (responding to, but not genuinely disputing, JWS New Mexico's and Kauffman Co.'s "additional undisputed facts"). <u>Accord</u> Tr. at 33:13-34:3 (Court, Milstein)(noting that the parties' briefings "emphasize[] their own facts," but do not genuinely dispute the other side's facts, and agreeing that the Court "can write one big set of facts using everybody's facts and then just give the best legal answer I can"). On these undisputed facts, the Court concludes that the Defendants are entitled to judgment as a matter of law on the Complaint's Second Claim for unpaid overtime wages, because the Plaintiffs are not covered "employees" under the NMMWA and are thus exempt from the NMMWA's overtime pay requirements pursuant to § 50-4-21(C)(5). The NMMWA exempts "salespersons or employees compensated upon piecework, flat rate schedules or commission basis," N.M. Stat. Ann. § 50-4-21(C)(5), and the Court concludes that JWS New Mexico paid the Plaintiffs on a commission basis.

# I.    THE PLAINTIFFS WORKED ON A COMMISSION BASIS.

The NMMWA does not define "commission." The Court notes, thus, "[t]he plain meaning of the word[] at issue."[52] Griego v. Oliver, 2014-NMSC-003, ¶ 21, 316 P.3d 865, 875 ("Under the rules of statutory construction, we first turn to the plain meaning of the words at issue, often using the dictionary for guidance." (quoting N.M. Att'y Gen. v. N.M. Pub. Regulation Comm'n, 2013-NMSC-042, ¶ 26, 309 P.3d 89, 97). Black's Law Dictionary defines "commission" as "[a] fee paid to an agent or employee for a particular transaction, usu. as a percentage of the money received from the transaction." Commission, Black's Law Dictionary (10th ed. 2014). See Commission, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/commission (defining commission as "a fee paid to an agent or employee for transacting a piece of business or performing a service")).

The dictionary definition gives the Court limited guidance in determining the issue at hand; the Court therefore looks to persuasive authority considering the FLSA. Featherstone v. Bureau of Revenue, 1954-NMSC- 080, ¶ 6, 273 P.2d 752, 753; Lopez v. Singh, 1949-NMSC-022, ¶ 7, 205 P.2d at 493; Armijo v. Wal-Mart Stores, Inc., 2007-NMCA-120, ¶ 47, 168 P.3d at 144 (looking to cases construing the FLSA for persuasive authority in interpreting an identical NMMWA provision); Garcia v. Am. Furniture Co., 1984-NMCA-090, ¶ 13, 689 P.2d at 937. A provision similar to the NMMWA's "commission" exception exists under the FLSA. The FLSA exempts employees when "more than half his compensation for a representative period (not less

---

[52]Olivo v. Crawford Chevrolet Inc. interprets the relevant NMMWA exemption, but the case defines neither "piecework" nor "flat rate," but rather conflates the two terms. Olivo v. Crawford Chevrolet Inc., 799 F. Supp. 2d at 1242-43.

than one month) represents commissions on goods or services." 29 U.S.C. § 207(i). The parties agree that precedent construing the FLSA is persuasive in interpreting the NMMWA. See Tr. at 52:18-19 (Milstein); MSJ at 7-8; Cross MSJ Memo at 7-19.

"The FLSA does not define the term 'commission.'" Parker v. NutriSystem, Inc., 620 F.3d 274, 278 (3d Cir. 2010). Federal regulations provide persuasive value in understanding "commissions" under the FLSA, but the regulations provide neither a definition nor test for determining whether a payment program constitutes payment on a commission basis. Casanova v. Gold's Tex. Holdings Grp., Inc., 2016 WL 1241548, at *6-7. Federal regulations note that "commissions" may be paid "on a percentage of total sales or of sales in excess of a specified amount, or on some other formula." 29 C.F.R. § 778.117.

> Although typically in retail or service establishments commission payments are keyed to sales, the requirement of the exemption is that more than half the employee's compensation represent commissions "on goods or services," which would include all types of commissions customarily based on the goods or services which the establishment sells, and not exclusively those measured by "sales" of these goods or services.

29 C.F.R. § 779.413.

> [F]ederal regulations provide two non-exhaustive examples of compensation plans that do not qualify as bona fide commissions: (1) a plan where the formula for computing commissions is such that the employee always or almost always earns the same fixed amount of compensation for each workweek; and (2) a plan where the employee receives a regular payment, constituting nearly his entire earnings, that is expressed in terms of a percentage of the sales which the business can always be expected to make; his wages are increased only slightly by a small percentage of sales above the expected quota. 29 C.F.R. § 779.416 (c).

Casanova v. Gold's Tex. Holdings Grp., Inc., 2016 WL 1241548, at *6.

Preliminarily, the Defendants note that, to fall within the exemption, the payment program need not compensate employees only in sales and need not use the word "commission." MSJ at

8-9. The Plaintiffs do not dispute this statement, and the Court agrees with it. The NMMWA's language states that the NMMWA exempts "salespersons and employees." N.M. Stat. Ann. § 50-4-21(C)(5). Regarding the FLSA, "neither case law nor [Department of Labor] [("]DOL["]) regulations establish a per se requirement that commission employees must be 'in sales.'" Johnson v. Wave Comm'n GR LLC, 4 F. Supp. 3d at 442 (quoting Owopetu v. Nationwide CATV Auditing Servs., Inc., 2011 WL 883703, at *4 (internal quotation marks omitted)). "[T]he word ["commission"] need not be used for the exemption to be applicable." Yi v. Sterling Collision Ctrs., Inc., 480 F.3d at 508 (citing Mechmet v. Four Seasons Hotels, Ltd., 825 F.2d at 1177; Klinedinst v. Swift Invs., Inc., 260 F.3d at 1254, 1257; 29 C.F.R. § 779.416; Department of Labor, Wage & Hour Division, Field Operations Handbook § 21h04(d) (July 12, 1990); Department of Labor, Opinion Letter No. FLSA152006-NA (June 29, 2006), www.dol.gov/esa/whd/opinion/FLSANA/2006/2006—06—29—15NA—F LSA.pdf). See Alvarado v. Corporate Cleaning Servs., Inc., 782 F.3d at 368 ("[T]he nomenclature is not determinative.").

"The essence of a commission is that it bases compensation on sales, for example a percentage of the sales price, as when a real estate broker receives as his compensation a percentage of the price at which the property he brokers is sold." Yi v. Sterling Collision Ctrs., Inc., 480 F.3d at 508. "[P]ersons not engaged in the sale of goods -- receivers, trustees, bailees, and others -- are sometimes compensated in the form of what are commonly called commissions, and . . . these are 'commissions' within the meaning of 29 U.S.C. § 207(i) if the other requirements of the section are satisfied." Mechmet v. Four Seasons Hotels, Ltd., 825 F.2d at 1175. See Alvarado v. Corporate Cleaning Servs., Inc., 782 F.3d at 367 (treating a compensation system as

a commission system when "the window washers are paid only if there's been a sale, namely a sale of window-washing service to a building owner or manager").

Several Courts of Appeals decisions have elaborated more specifically on what constitutes a commission. See Yi v. Sterling Collision Ctrs., Inc., 480 F.3d 505; Alvarado v. Corporate Cleaning Servs., Inc., 782 F.3d 365; Parker v. NutriSystem, Inc., 620 F.3d 274; Klinedinst v. Swift Investments, Inc., 260 F.3d 1251; Mechmet v. Four Seasons Hotels, Ltd., 825 F.2d 1173. The United States Courts of Appeals for the Seventh Circuit, in an opinion that the Honorable Richard Posner, United States Circuit Judge for the Seventh Circuit, wrote, and that the Honorable John Coffey, United States Circuit Judge for the Seventh Circuit and the Honorable Jesse Eschbach, United States Circuit Judge for the Seventh Circuit, joined, first encountered the question in 1987. See Mechmet v. Four Seasons Hotels, Ltd., 825 F.2d 1173. In Mechmet v. Four Seasons Hotels, Ltd., the Seventh Circuit concluded that a hotel paid banquet staff a commission when it added an "18 percent service charge to every banquet charge and distribute[d] 16 percent among the staff serving the banquet, according to rank (captain, waiter, busboy, etc.), and the rest among the banquet sales staff." 825 F.2d at 1175. In reaching its determination, the court considered the FLSA's purposes: preventing workers from taking "abnormally long hours" from those who preferred shorter hours, spreading work and reducing unemployment, and protecting overworked employees from injuring themselves. 825 F.2d at 1176. Regarding the staff's hours, the Seventh Circuit noted:

> It would be impossible in these circumstances to arrange things so that every banquet waiter worked 40 hours every week. In a busy week the Ritz's small staff of regular banquet waiters (there are only 10) may have to work additional hours in order to take care of all the banquets.

825 F.2d at 1177.

More recently, the Seventh Circuit, in a decision written by Judge Posner, addressed the question of what constitutes payment on a commission basis in <u>Yi v. Sterling Collision Centers, Inc.</u>  The Seventh Circuit considered auto workers compensated as follows:

> [The auto repair shop] calculates the number of hours normally required to do a given type of repair (these are called "booked hours") and multiplies that number by a dollar figure.  The product of this multiplication is the labor price of the repair to the customer.  Sterling adds material costs to the labor price to come up with a final price.  A team of mechanics is then assigned to the job.  Each member of the team keeps track of the hours he works on the job.  When it's completed and the hours of the team members are added up, Sterling determines each member's compensation by multiplying (1) the number of booked hours for the job by (2) the ratio of the team member's actual hours worked to the total hours worked by the team, and then by (3) a wage, per booked (not actually worked) hour, based on the skill or quality of the individual team member.

480 F.3d at 509.  In determining that the automobile repair shop employees earned a commission, Judge Posner focused on the connection between the commission and the sale, the proportionality between the sale's value to the customer and the compensation, and the employees' irregular hours.  <u>See</u> 480 F.3d at 509-10.  In addition, Judge Posner noted, citing <u>Mechmet v. Four Seasons Hotels, Ltd.</u>, that the program did not offend the FLSA's purposes.  <u>See</u> <u>Yi v. Sterling Collision Ctrs., Inc.</u>, 480 F.3d at 510 (citing <u>Mechmet v. Four Seasons Hotels, Ltd.</u>, 825 F.2d at 1175-76).  Judge Posner describes commission systems generally:

> The essence of a commission is that it bases compensation on sales, for example a percentage of the sales price, as when a real estate broker receives as his compensation a percentage of the price at which the property he brokers is sold.  Although his income is likely to be influenced by the number of hours a week that he works, the relation is unlikely to be a regular one.  In one week business may be slow; he may make no sales and thus have no income for that week.  The next week business may pick up and by working overtime that week he may be able to make up the income he lost because of slack business the previous week.  Over a year his hours of work may be similar to those of regular hourly employees.  So if he had to be paid overtime, his annual income would be higher than theirs even though he hadn't worked more hours over the course of the year than they had.

<u>Yi v. Sterling Collision Ctrs., Inc.</u>, 480 F.3d at 508.

In <u>Alvarado v. Corporate Cleaning Services, Inc.</u>, which Judge Posner wrote, Judge Posner concluded that a window washing service that calculated its window washers' compensation based on points assigned to each job paid the window washers through a commission system. <u>See</u> 782 F.3d at 366-69. Judge Posner explained the compensation program:

> When CCS receives a window-washing order, it calculates the number of "points" to assign to the job based on the job's complexity and the estimated number of hours that the window washers will take to complete it; usually each worker assigned to the job gets the same share of the points allocated to it. CCS pays each window washer the number of points allocated to him multiplied by a rate, specific to each worker, that is specified in the company's collective bargaining agreement with the union that represents the employees, the Service Employees International Union (SEIU). CCS also uses the number of points assigned to a job to determine the price it charges to customers; naturally it uses a higher ratio of dollars per point for setting its price for customers than for compensating its employees, so that it can make a profit. And CCS regularly makes price adjustments, such as adding the costs of permits and equipment rentals, rounding the price to the nearest $25 increment, and reducing the price because of competition or a desire to maintain good relations with customers. These adjustments cause the percentage of the price attributable to window washers' compensation to vary from job to job.

<u>See</u> 782 F.3d at 366-67. Judge Posner based his conclusion on the facts that the compensation was tied to a sale, <u>see</u> 782 F.3d at 367, the window washers received a "percentage of the price attributable" to the charge for customers, 782 F.3d at 368, and the window washers worked irregular hours, <u>see</u> 782 F.3d at 368. Regarding the irregular hours, Judge Posner wrote:

> An employee who is paid by the sale is not a commission worker if his sales are made at a uniform rate (e.g., one sale per hour), so that the ratio of his hours worked to his pay is constant. For in that case his pay is effectively hourly. That's why piece-rate workers are not within the commission exception: because they keep producing even when no sale is imminent, the relation between the hours they work and their output tends to be constant.

<u>Alvarado v. Corporate Cleaning Servs., Inc.</u>, 782 F.3d at 368.

The United States Courts of Appeals for the Third and Eleventh Circuits have also spoken to what defines pay on a "commission" basis. In <u>Parker v. NutriSystem, Inc.</u>, written by the Honorable D. Michael Fisher, United States Circuit Judge for the Third Circuit, the Third Circuit concluded that a meal plan provider paid sales associates on a commission basis when the associates received flat rates according to the sales they made. <u>See</u> 620 F.3d at 283. The Third Circuit explained that the sales associates received compensation proportional to the sales, the meal plan provider "base[d] compensation on sales," by compensating the sales associates in the manner described, the meal plan provider motivated the sales associates to "take undesirable shifts and to work harder," and the compensation program did not offend the FLSA. 620 F.3d at 283-84. In <u>Klinedinst v. Swift Investments, Inc.</u>, in an opinion written by the Honorable Charles Wilson, United States Circuit Judge for the Eleventh Circuit, with the Honorable Jane Restani, United States Judge for the United States Court of International Trade, sitting by designation, concurring in part and dissenting in part, the Eleventh Circuit determined that an automobile shop that calculated its employees' pay according to predetermined hours per job paid its employees on a commission basis, and noted that the system "provide[s] incentives for employees to work efficiently and effectively to the benefit of the employer, who may then take on more customers at a greater profit margin, and the employee, who reaps the benefits of increased flag hours regardless of the actual amount of hours worked." 260 F.3d at 1256.

District courts have drawn on the foregoing cases to create tests for identifying "commission" systems. Between the MSJ and the Cross MSJ, the parties cite all of these tests. In the MSJ Response, the Plaintiffs cite <u>Casanova v. Gold's Texas Holdings Group, Inc.</u>, which sets forth a four-part test:

> First, a bona fide commission is either a percentage or proportion of the ultimate price passed on to the consumer. <u>See</u> <u>Parker</u>, 620 F.3d at 283; <u>Yi</u>, 480 F.3d at 508. Second, a bona fide commission is decoupled from actual time worked, so that there is an incentive for the employee to work more efficiently and effectively. <u>See</u> <u>Parker</u>, 620 F.3d at 284; <u>Yi</u>, 480 F.3d at 509; <u>Charlot</u>, [136 F. Supp. 3d at 453]. Third, the type of work is such that its "peculiar nature" does not lend itself to a standard eight-hour work day. <u>Alvarado</u>, 782 F.3d at 368. Fourth, the compensation system must not offend the purposes of the FLSA. <u>Id</u>.

<u>Casanova v. Gold's Tex. Holdings Grp., Inc.</u>, 2016 WL 1241548, at *8 (concluding that, when a gym paid trainers a percentage of the amount the gym charged clients for hour-long sessions, the gym did not pay the trainers on a commission basis, because the trainers' pay correlated to the hours worked and the program might have encouraged "excessive hours without compensation").

The Plaintiffs also cite <u>Johnson v. Wave Communication GR LLC</u>. <u>See</u> <u>Johnson v. Wave Comm'n GR LLC</u>, 4 F. Supp. 3d 423. <u>Johnson v. Wave Comm'n GR LLC</u> follows a three-factor test:

> (1) [T]he employee's compensation must be tied to customer demand or the quantity of sales; (2) the compensation plan must provide performance-based incentives for the employee to increase his or her income; and (3) there must be proportionality between the value of the goods or services sold and the rate paid to the employee.

<u>Johnson v. Wave Comm'n GR LLC</u>, 4 F. Supp. 3d at 442 (internal citations omitted)(quoting <u>Owopetu v. Nationwide CATV Auditing Servs., Inc.</u>, 2011 WL 883703, at *4 (determining that cable installers compensated based on the installations performed and the installations' value to the customer received commissions)). Regarding the test, the Honorable Christina Reiss, United States Chief Judge for the District of Vermont, in <u>Owopetu v. Nationwide CATV Auditing Services, Inc.</u>, explained: "These three components ensure that commission-based compensation is 'decoupled from the actual time worked,' a characteristic that multiple circuit courts of appeals and the DOL have identified as a 'hallmark' of how commissions work." <u>Owopetu v. Nationwide CATV Auditing Servs., Inc.</u>, 2011 WL 883703, at *4 (citing <u>Parker v. NutriSystem, Inc.</u>, 620 F.3d

at 284 (concluding that technicians paid a proportion of "the scheduled rate for the specific jobs performed" received commissions)). The Defendants acknowledge the tests from both Casanova v. Gold's Texas Holdings Group, Inc. and Charlot v. Ecolab, Inc., but the Defendants emphasize that the only test articulated by a Tenth Circuit district court is the test in Matrai v. DirecTV, LLC. See MSJ at 9-11; MSJ Response at 4-5; Cross MSJ at 14; Cross MSJ Response at 6. The Honorable Sam A. Crow, United States Senior District Judge for the District of Kansas, in Matrai v. DirecTV, LLC, noted: "Simply put, a commission system pays employees upon a sale, at a rate that is related to the price of the sale, and for work involving irregular hours." Matrai v. DirecTV, LLC, 168 F. Supp. 3d at 1364 (concluding that, by paying technicians by the job without considering hours to perform the job, DirecTV compensated the technicians by commission).

Considering the foregoing cases, the Court concludes that the parties have identified the characteristics relevant to "commission" systems and that Casanova v. Gold's Texas Holdings Group, Inc. best synthesizes the concerns reflected in the caselaw. Nevertheless, the Court articulates its own test synthesizing the elements for a commission system. The Court combines Casanova v. Gold's Texas Holdings Group, Inc.'s test with Matrai v. DirecTV, LLC's test to do so. While the Court draws heavily on Casanova v. Gold's Texas Holdings Group, Inc.'s test, the Court breaks the first factor from Casanova v. Gold's Texas Holdings Group, Inc.'s test into two components, as the courts in Owopetu v. Nationwide CATV Auditing Services, Inc. and Matrai v. DirecTV, LLC did. The Court believes that so doing clarifies that employees receive commissions both in proportion to sale prices and in correlation to sales being made and that the first element in Casanova v. Gold's Texas Holdings Group, Inc.'s test -- "a bona fide commission is either a percentage or proportion of the ultimate price passed on to the consumer" -- limits the inquiry to

whether the commission corresponds to the sale price. Casanova v. Gold's Tex. Holdings Grp., Inc., 2016 WL 1241548, at *8.

The Court identifies the following elements as characterizing commission systems. First, "[a] commission system pays employees upon a sale." Matrai v. DirecTV, LLC, 168 F. Supp. 3d at 1364. See e.g., Alvarado v. Corporate Cleaning Servs., Inc., 782 F.3d at 368; Yi v. Sterling Collision Ctrs., Inc., 480 F.3d at 509-10; Johnson v. Wave Comm'n GR LLC, 4 F. Supp. 3d at 442. Second, the payment is "at a rate that is related to the price of the sale." Matrai v. DirecTV, LLC, 168 F. Supp. 3d at 1364. See, e.g., Alvarado v. Corporate Cleaning Servs., Inc., 782 F.3d at 368, Yi v. Sterling Collision Ctrs., Inc., 480 F.3d at 509-10; Casanova v. Gold's Tex. Holdings Grp., Inc., 2016 WL 1241548, at *8; Johnson v. Wave Comm GR LLC, 4 F. Supp. 3d at 442. Third, "a bona fide commission is decoupled from actual time worked, so that there is an incentive for the employee to work more efficiently and effectively." Casanova v. Gold's Tex. Holdings Grp., Inc., 2016 WL 1241548, at *8. See, e.g., Johnson v. Wave Comm'n GR LLC, 4 F. Supp. 3d at 442; Parker v. NutriSystem, Inc., 620 F.3d at 284. Fourth, the employees work irregular hours, because the "type of work . . . does not lend itself to a standard eight-hour work day," Casanova v. Gold's Tex. Holdings Grp., Inc., 2016 WL 1241548, at *8. See Matrai v. DirecTV, LLC, 168 F. Supp. 3d at 1364. See, e.g., 782 F.3d at 368, Yi v. Sterling Collision Ctrs., Inc., 480 F.3d at 509-10. Fifth, "the compensation system must not offend the purposes of the" NMMWA. Casanova v. Gold's Tex. Holdings Grp., Inc., 2016 WL 1241548, at *8. See, e.g., Yi v. Sterling Collision Ctrs., Inc., 480 F.3d at 509-10; Mechmet v. Four Seasons Hotels, Ltd., 825 F.2d at 1176.

The Court is not persuaded that, because Matrai v. DirecTV, LLC is the only case from a court in the Tenth Circuit -- albeit a district court -- defining commission payment systems, the

- 68 -

Court need adopt the test articulated in Matrai v. DirecTV, LLC, which excludes whether the compensation system decouples hours from pay and offends the FLSA. See Matrai v. DirecTV, LLC, 168 F. Supp. 3d at 1364. JWS New Mexico and Kauffman Co particularly dispute whether a commission system must decouple hours from pay and note that, in including decoupling hours from pay as a factor for commission systems, the Plaintiffs rely on authority only from outside the Tenth Circuit. See MSJ at 6. The Court notes that, as another district court opinion, Matrai v. DirecTV, LLC provides only persuasive authority. Judge Crow, relies on cases from outside the Tenth Circuit to develop his test, because no other Tenth Circuit opinion addresses commission systems. See 168 F. Supp. 3d at 1362-64. Although the Court largely agrees with Judge Crow's definition of commission systems, the Court concludes that several courts emphasize that commission systems decouple hours from pay. See Alvarado v. Corporate Cleaning Servs., Inc., 782 F.3d at 369; Parker v. NutriSystem, Inc., 620 F.3d at 284; Johnson v. Wave Comm'n GR LLC, 4 F. Supp. 3d at 442 (internal citations omitted)(quoting Owopetu v. Nationwide CATV Auditing Servs., Inc., 2011 WL 883703, at *4); Casanova v. Gold's Tex. Holdings Grp., Inc., 2016 WL 1241548, at *8. Even the court in Matrai v. DirecTV, LLC discusses decoupling hours from pay:

> Their rate of pay did not depend on the actual time it took to complete the job. The more jobs the Matrais completed . . . , the more they were paid. Thus, installers wanting to make more money had the incentive to do their work efficiently and effectively as to do more jobs in a day . . . .

See Matrai v. DirecTV, LLC 168 F. Supp. 3d at 1365. Further, the Defendants acknowledge that incentivizing efficiency, a characteristic that they admit defines commission systems, is interrelated with decoupling hours and pay.[53] See Cross MSJ Response at 8, 11. The Defendants

---

[53]Commission systems' incentivizing effects arise only because the pay is decoupled from hours worked; the decoupling enables employees to make more in a given time frame by

exert more effort arguing that JWS New Mexico's payment system decouples hours from pay than they do arguing the characteristic's irrelevance.  See Cross MSJ Response at 8-11.

A.    **JWS NEW MEXICO PAID THE PLAINTIFFS UPON A SALE, AND IT PAID THE PLAINTIFFS AT A RATE PROPORTIONAL THE SALE.**

The Court concludes that JWS New Mexico's compensation system meets the first two elements for a commission system.  First, JWS New Mexico tied the Plaintiffs' pay to services sold.  Second, the pay was proportional to the sales.

The Plaintiffs concede in their MSJ response that JWS New Mexico's compensation program satisfies the first two elements for a commission system.  See MSJ Response at 5. Confusingly, the Plaintiffs aver in their Cross Memo. that "no evidence has been presented indicating that these employees' compensation is tied to customer demand or that there is proportionality between the value of the services sold and the rate paid to the employees."  See MSJ Response at 14.  The Plaintiffs filed the MSJ Response after they filed the Cross MSJ Response.  See Cross MSJ Memo at 1; MSJ Response at 1.  Accordingly, he Plaintiffs may have conceded this point following the Cross Memo.  The Plaintiffs also limited their argument on this point in the Cross MSJ Memo to one line, and so the Plaintiffs do not emphasize this dispute.  See Cross MSJ Response at 14.

Regardless, JWS New Mexico paid its employees on sales of their services, like the window-washing service in Alvarado v. Corporate Cleaning Services., Inc., 782 F.3d at 367, and JWS New Mexico paid the Plaintiffs in proportion to the sales, as the banquet staff in Mechmet v.

─────────────────────────

completing more tasks in that time.  See Yi v. Sterling Collision Ctrs., Inc., 480 F.3d at 509.  By contrast, an employee receiving wages tied to time receives only the amount allocated for that timeframe.

Four Seasons Hotels, Ltd., 825 F.2d at 1175, were paid. The Plaintiffs always made twenty-five percent of each charge to the customer; this rate is a consistent percentage of the price that JWS New Mexico charged the customer. See MSJ ¶ 11, at 4 (citing Herrera Decl. ¶ 5, at 2; Herrera Depo. at 79:15-25; Corman Depo. at 68:5-8); MSJ ¶ 16, at 5 (citing Herrera Decl. ¶ 5, at 2).

The Plaintiffs make much of the fact that JWS New Mexico calculates some charges to customers based on the actual hours driven for a job. This argument is best addressed under the next characteristic of commission systems -- whether the employer decoupled the pay from hours worked. On the first two factors, JWS New Mexico's program seems to be a commission compensation system. See Casanova v. Gold's Texas Holdings Group, Inc., 2016 WL 1241548, at *8 (concluding, regarding the commission systems' first characteristics that "the undisputed evidence establishes that trainers were paid a percentage of the fee paid for the session . . . . This fact would seem to indicate the existence of a bona fide commission compensation program.").[54]

### B.    THE PLAINTIFFS WORKED IRREGULAR HOURS.

JWS New Mexico has presented evidence illustrating the Plaintiffs' hours' irregularity; the Plaintiffs' hours varied throughout both the week and the year. See MSJ ¶ 3, at 3 (quoting Corman Depo. at 10:6-11); MSJ ¶ 3 n.3 (citing Corman Depo. at 12:10-13:18; id. at 19:23-25; id. at 53:24-55:8; id. at 58:15-18; JWS Policies re Driver's Logs, filed June 17, 2016 (Doc. 40-2); Daily Logs, filed June 17, 2016 (Doc. 40-1)); MSJ ¶ 4, at 3 (quoting De La Torre Depo. 23:1-6); MSJ ¶ 5, at 3 (quoting Garcia Depo. at 27:6-14); MSJ ¶ 6, at 3 (quoting Lizardo Depo. at 10:13-20); MSJ ¶ 8, at 3 (citing Herrera Decl. ¶ 3, at 1); MSJ ¶ 8, at 3 (citing Herrera Decl. ¶ 3, at 1); MSJ ¶ 9, at 3-4

---

[54]For an analysis addressing the Plaintiffs' arguments about yard time, see Section III of the Analysis.

(citing Herrera Decl. ¶ 4, at 1-2).  The Plaintiffs do not try to dispute that the irregularities exist; rather, the Plaintiffs contend that the irregularity conflicts with the NMMWA's purpose.  The Court does not accept the Plaintiffs' invitation to conclude, based on theories about the NMMWA's purposes, that the Plaintiffs' hours were not irregular.

According to the Plaintiffs, the NMMWA's purpose counsels against determining that the Plaintiffs' hours are irregular in the manner characteristic of a commission system.  The Plaintiffs worked more than forty hours every week, but, the Plaintiffs contend, the commission exemption accounts for employees who work less than forty hours in some weeks and more than forty hours in other weeks.  See MSJ Response at 7-9.  Such a work pattern would balance to forty hours on average a week.  See MSJ Response at 7-9.  In Yi v. v. Sterling Collision Centers, Inc., Judge Posner mentions as one rationale for the commission exemption: "Over a year his hours of work may be similar to those of regular hourly employees.  So if he had to be paid overtime, his annual income would be higher than theirs even though he hadn't worked more hours over the course of the year than they had."  Yi v. v. Sterling Collision Ctrs., Inc., 480 F.3d at 509.

A cap on irregular hours is not, however, a characteristic of a commission system.  No court has created such a cap, and, in one case in which a court determined that a commission system existed, the employees, like the Plaintiffs, worked over forty hours a week.  Walton v. United Consumers Club, Inc., 786 F.2d 303, 312 (7th Cir. 1986)(stating that one employee, "for example, claimed that she had worked from 1:30 p.m. to 11:00 p.m. every Monday through Friday, 9:30 a.m. to 5:30 p.m. every Saturday, and every Sunday for four months").[55]

---

[55]The FLSA already addresses the possibility that the pay to hours ratio for commission employees might not equal or exceed that of hourly employees.  The commission exemption applies if only: "the regular rate of pay of such employee is in excess of one and one-half times

The Court therefore declines the Plaintiffs' invitation to disregard the irregular hours, solely because the Plaintiffs worked many hours. The Court concludes that the Defendants have shown that its compensation system satisfies the third element for compensation on a "commission" basis, because the Plaintiffs work irregular hours.

### C. JWS NEW MEXICO'S COMPENSATION PROGRAM DECOUPLED THE PLAINTIFFS' PAY FROM THEIR HOURS AND INCENTIVIZED EFFICIENCY.

The parties dispute focuses largely on whether, when JWS New Mexico charged customers hourly rates -- which JWS New Mexico calculated according to actual hours per job, see MSJ ¶ 15, at 5 (citing Herrera Decl. ¶ 9, at 2; Herrera Depo. at 49:13-18) -- JWS New Mexico decoupled the Plaintiffs' compensation from their hours. Cross Memo. at 15-17; Cross MSJ Reply at 5-6; MSJ Response at 5-7; Cross MSJ Response at 8-13; MSJ Reply at 4-7; Tr. at 9:2-24 (Johnson). The Defendants, and the Plaintiffs, agree that JWS New Mexico decoupled the Plaintiffs' pay from their hours when JWS New Mexico compensated the Plaintiffs for hourly bid rate -- computed according to estimated hours for the job, see MSJ ¶ 13, at 4-5 (citing Herrera Decl. ¶ 7, at 2; Herrera Depo. at 47:15-49:6) -- or barrel bid rate --calculated by the number of barrels for a job, see MSJ ¶ 14, at 5 (citing Herrera Decl. ¶ 8, at 2; Herrera Depo. at 45:6-47:14) -- jobs. See Cross Memo. at 15-17; Cross MSJ Reply at 5-6; MSJ Response at 5-7; Cross MSJ Response at 8-13; MSJ Reply at 4-7. The parties disagree whether, for hourly rate jobs, because the customers' prices correlated to the Plaintiffs' hours, JWS New Mexico effectively paid the Plaintiffs an hourly rate. See Cross

---

the minimum hourly rate applicable to him under section 206 of this title." 29 U.S.C. § 207. No similar qualification regarding the pay to hours ratio exists in the NMMWA exemption. See N.M. Stat. Ann. § 50-4-21(C)(5). Nevertheless, the silence does not mean that the New Mexico Legislature invited courts to read such limitations into "commission," and the Court declines to add language not in the statute.

Memo. at 15-17; Cross MSJ Reply at 5-6; MSJ Response at 5-7; Cross MSJ Response at 8-13; MSJ Reply at 4-7. The Court agrees with the Defendants that the Plaintiffs' hours were decoupled from their time and incentivized efficiency.

The Plaintiffs want to characterize the hourly rate jobs as hourly pay. See Cross Memo. at 15-17; Cross MSJ Reply at 5-6; MSJ Response at 5-7. The Plaintiffs argue that the hourly rate jobs resemble the training jobs in Casanova v. Gold's Texas Holdings Group., Inc.; the Plaintiffs' pay, like the trainers', correlates to the hours worked. See MSJ Response at 5-6 (citing Casanova v. Gold's Tex. Holdings Grp., Inc., 2016 WL 1241548, at *8). According to the Plaintiffs, JWS New Mexico "keyed" the Plaintiffs' pay to their hours. Cross Memo. at 17. The Plaintiffs contend that, as in Casanova v. Gold's Texas Holdings Group, Inc., "a one-to-one correlation existed between the hours a[n employee] worked and his or her compensation." MSJ Response at 5-6 (quoting Casanova v. Gold's Tex. Holdings Grp., Inc., 2016 WL 1241548, at *8). According to the Plaintiffs, because, only fifty percent of the Plaintiffs' jobs were hour bid rate and barrel bid rate jobs, and hour rate jobs constituted the other fifty percent, JWS New Mexico's compensation system as a whole does not qualify as a commission system. See Cross Memo. at 15; MSJ Response at 5.

The Defendants contend that JWS New Mexico still decoupled hours from pay when it calculated the customers' charges according to the Plaintiffs' actual hours for jobs. According to the Defendants, JWS New Mexico wrote down the Plaintiffs' hours to charge the customer for reasonable hours. See Cross MSJ Response at 8-10. According to the Defendants, this writing down illustrates that it charged customers for reasonable times for jobs rather than for actual times. See Cross MSJ Response at 9-10. The Defendants aver that JWS New Mexico therefore calculated

the customers' price, while considering the actual and reasonable time to complete the job, and then compensated the Plaintiffs according to the price charged. See Cross MSJ Response at 9-10; Tr. at 13:19-23 (Johnson). The Defendants analogize the compensation system to writing down attorneys' time; a firm might charge a client for reasonable time worked on a matter rather than the full hours input on it. See Tr. at 10:18-11:3 (Johnson). In this analogy, if a lawyer received a commission based on the amount charged the client, the lawyer would not receive hourly pay; a lawyer receiving hourly pay would be compensated for his or her time, regardless the value charged the customer.

The Court concludes that JWS New Mexico decoupled the Plaintiffs' hours from their pay. Because JWS New Mexico wrote down hours, the Plaintiffs' pay, unlike the trainers' compensation in Casanova v. Gold's Texas Holdings Group, Inc., did not correlate one-to-one with their hours. Even if JWS New Mexico wrote down hours only occasionally, that JWS New Mexico wrote down hours illustrates that JWS New Mexico decoupled the Plaintiffs' pay from their hours by calculating reasonable hours when charging customers.[56] This emphasis on reasonableness does not differ significantly from payment programs, like that in Alvarado v. Corporate Cleaning Services, Inc., in which an employer calculates customers' costs according to a jobs' complexity and expected duration. While some correlation existed between the Plaintiffs' hours and pay, how JWS New Mexico charged customers and how JWS New Mexico paid the Plaintiffs are different considerations. JWS New Mexico asked customers to pay for reasonable

---

[56]The Plaintiffs, by arguing that JWS New Mexico unlawfully withheld payment for hours written down, see Cross Reply at 5, do not show that the Plaintiffs' hours were not decoupled from their pay. Rather, the Plaintiffs admit that JWS New Mexico did not compensate the Plaintiffs in direct correlation with their hours.

hours worked, and JWS New Mexico gave the Plaintiffs twenty-five percent of that requested charge.

Such a compensation system incentivizes efficiency. While the Plaintiffs state that the Defendants did not use the compensation system to "incentivize their drivers to work more efficiently," Cross MSJ at 14, caselaw does not suggest that employers must intend to motivate their employees. The court in Casanova v. Gold's Texas Holdings Group, Inc., describes the incentive element as resulting from decoupling pay from time worked. See 2016 WL 1241548, at *8 ("Second, a bona fide commission is decoupled from actual time worked, so that there is an incentive for the employee to work more efficiently and effectively[.]"). See also Klinedinst v. Swift Invs., Inc., 260 F.3d at 1256 (noting, without discussing facts about the employer's goal, that the payment program "provide[s] incentives for employees to work efficiently and effectively to the benefit of the employer, who may then take on more customers at a greater profit margin, and the employee, who reaps the benefits of increased flag hours regardless of the actual amount of hours worked."); Parker v. NutriSystem, Inc., 620 F.3d at 284 (considering incentives without mentioning the employer's intent and explaining without considering the employer's subjective opinion: "[F]rom a policy standpoint it is reasonable to permit NutriSystem to offer different commissions . . . . This encourages sales staff to take undesirable shifts and to work harder to close a sale on outgoing calls."); Johnson v. Wave Comm'n GR LLC, 4 F. Supp. 3d at 442 (discussing the incentive element in the passive voice as related to the compensation system, but not mentioning the employer's intent). JWS New Mexico's compensation system motivates the Plaintiffs to perform their work "efficiently and effectively," Klinedinst v. Swift Invs., Inc., 260 F.3d at 1256, because the Plaintiffs risk having JWS New Mexico write down excessive hours on

hourly rate jobs and "the more jobs" -- hourly rate, hourly bid rate, or barrel bid rate jobs -- the Plaintiffs complete "the more they [are] paid," Matrai v. DirecTV, LLC, 168 F. Supp. 3d at 14. The Plaintiffs differ from the trainers in Casanova v. Gold's Texas Holdings Group, Inc., who could not increase their pay without increasing their hours by the same proportion. The Plaintiffs can, like automobile repair men, installers, or technicians, earn more by working more efficiently. See Matrai v. DirecTV, LLC, 168 F. Supp. 3d at 1365; Johnson v. Wave Comm'n GR LLC, 4 F. Supp. 3d at 442; Owopetu v. Nationwide CATV Auditing Servs., Inc., 2011 WL 883703, at *5.

Accordingly, the Court concludes that JWS New Mexico's compensation system satisfies the third factor characterizing commission systems. JWS New Mexico's payment program decoupled the Plaintiffs' hours from their pay and incentivized the Plaintiffs' to complete their work more efficiently.[57]

### D. JWS NEW MEXICO'S COMPENSATION SYSTEM DOES NOT OFFEND THE NMMWA.

The Court concludes that JWS New Mexico's compensation system does not offend the NMMWA, because the Plaintiffs work long hours. The NMMWA exemption is broader than the parallel exemption in the FLSA. Further, JWS New Mexico's compensation system shares important characteristics with commission systems.

The Plaintiffs contend that JWS New Mexico's compensation system offends the NMMWA's purposes, because the Plaintiffs work over forty hours a week. See MSJ Response at 3-4. The Plaintiffs argue that the NMMWA's purposes are to "put a floor on wages and a ceiling

---

[57]For an analysis addressing the Plaintiffs' arguments about "yard time," see Section III of the Analysis.

on hours." MSJ Response at 3 (quoting <u>N.M. Dep't of Labor v. A.C. Elec., Inc.</u>, 1998-NMCA-141, ¶ 15, 965 P.2d at 366). The Plaintiffs quote "the spreading of work and extra compensation for overtime, no matter how high the regular wage paid may be." MSJ Response at 3 (quoting <u>Wilson Oil Co. v. Hardy</u>, 1945-NMSC-013, ¶ 24, 164 P.2d at 213-14). The Plaintiffs cite <u>Mechmet v. Four Seasons Hotels, Ltd.</u> to further explicate the NMMWA's goals. <u>See</u> MSJ Response at 3-4. Judge Posner, in <u>Mechmet v. Four Seasons Hotels, Ltd.</u> explained:

> The first purpose was to prevent workers willing (maybe out of desperation, though this is no longer very likely) to work abnormally long hours from taking jobs away from workers who prefer to work shorter hours. In particular, unions' efforts to negotiate for overtime provisions in collective bargaining agreements would be undermined if competing, non-union firms were free to hire workers willing to work long hours without overtime. The second purpose was to spread work and thereby reduce unemployment, by requiring an employer to pay a penalty for using fewer workers to do the same amount of work as would be necessary if each worker worked a shorter week. The third purpose was to protect the overtime workers from themselves: long hours of work might impair their health or lead to more accidents (which might endanger other workers as well).

825 F.2d at 1176.

The Plaintiffs rest their arguments partly on statements about the FLSA's purposes. The Plaintiffs emphasize the purposes that <u>Mechmet v. Four Seasons Hotels, Ltd.</u> listed. Judge Posner, in <u>Mechmet v. Four Seasons Hotels, Ltd.</u>, however, mentioned those purposes while discussing the FLSA. The Supreme Court of New Mexico in <u>Wilson Oil Co. v. Hardy</u> likewise discusses the FLSA rather than the NMMWA.

The NMMWA states its purposes as only:

> (1) to establish minimum wage and overtime compensation standards for all workers at levels consistent with their health, efficiency and general well-being, and (2) to safeguard existing minimum wage and overtime compensation standards which are adequate to maintain the health, efficiency and general well-being of workers against the unfair competition of wage and hours standards which do not provide adequate standards of living.

N.M. Stat. Ann. § 50-4-19.

The Supreme Court of New Mexico has not discussed the NMMWA's purposes, but Courts of Appeals of New Mexico, following New Mexico Department of Labor v. A.C. Electronics, Inc., have addressed the question. Courts of Appeals of New Mexico have noted that "the Act is a statute with a remedial purpose and that it must be construed liberally to accomplish that purpose." N.M. Dep't of Labor v. Echostar Comm'ns Corp., 2006-NMCA-047, ¶ 7, 134 P.3d 780, 782 (citing N.M. Dep't of Labor v. A.C. Elec., Inc., 1998-NMCA-141, ¶ 13, 965 P.2d at 363). New Mexico Department of Labor v. A.C. Electronics, Inc. refers to the NMMWA, in stating Congress and the states passed hour and wage laws to "put a floor on wages and a ceiling on hours." 1998-NMCA-141, ¶ 15, 965 P.2d at 366. New Mexico Department of Labor v. Echostar Communications Corp., 2006-NMCA-047, P.3d 780, cited sister states' interpretations of similar statutes, and it listed purposes similar to the FLSA's -- limiting maximum hours worked, spreading employment, and compensating employees working excess hours. See New Mexico Dep't of Labor v. Echostar Comm'ns Corp., 2006-NMCA-047, ¶ 7, 134 P.3d at 782 (citing Janes v. Otis Eng'g Corp., 757 P.2d 50, 53 (Alaska 1988); Skyline Homes, Inc. v. Dep't of Indus. Relations, 211 Cal. Rptr. 792, 798 (Ct. App. 1985)).

The Court must predict how the Supreme Court of New Mexico would articulate the NMMWA's purposes. Guidance Endodontics, LLC v. Dentsply Int'l., Inc., 708 F. Supp. 2d at 1224-25. While the Supreme Court of New Mexico has not addressed the question, the Supreme Court of New Mexico supports viewing New Mexico statutes, and their purposes, in light of similar federal statutes. The Supreme Court of New Mexico has looked to the FLSA to interpret the NMMWA. Valentine v. Bank of Albuquerque, 1985-NMSC-033, ¶ 4, P.2d at 490. Further, the

Supreme Court of New Mexico stated that "two statutes covering the same subject matter should be harmonized and construed together when possible, in a way that facilitates their operation and the achievement of their goals." State ex rel. Schwartz v. Sanchez, 1997-NMSC-021, ¶ 7, 936 P.2d 334, 335 (internal quotation marks omitted)(citing Quintana v. Schnedar, 1993 -NMSC- 033, ¶ 4, 855 P.2d 562, 564-65). Accordingly, the Court concludes that the Supreme Court of New Mexico would agree with both the Plaintiffs and the Courts of Appeals of New Mexico's depictions of the NMMWA's goals. The statements align the NMMWA, the FLSA, and other similar statutes, and the Supreme Court of New Mexico would also look to those statutes as persuasive evidence for the NMMWA's purposes. The statements also parallel the Supreme Court of New Mexico's explanation for the FLSA's purposes in Wilson Oil Co. v. Hardy, 1945-NMSC-013, ¶ 24, P.2d at 213-14; the discussions focus on compensation for overtime, adequate wages, and spreading work.

Nevertheless, the NMMWA exemption's purposes have not been stated. While the FLSA and the NMMWA have many similar characteristics and likely have similar goals, the statutes, and particularly the exemptions at issue, differ. The NMMWA's exemption for commission, flat rate, and piecework is broader than the FLSA's commission exemption. Not only does the NMMWA contain additional exclusions for "flat rate" and "piecework," the NMMWA does not qualify the commissions available for exemption as the FLSA does. The NMMWA exempts all "salespersons or employees compensated upon piecework, flat rate schedules or commission basis." N.M. Stat. Ann. § 50-4-21(C)(5). The FLSA exempts an employee if "the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate applicable to him under section 206 of this title," and "more than half his compensation for a representative

period (not less than one month) represents commissions on goods or services." 29 U.S.C. § 207(i). The FLSA provides that commissions are "all earnings resulting from the application of a bona fide commission rate . . . without regard to whether the computed commissions exceed the draw or guarantee." 29 U.S.C. § 207(i). The NMMWA not only excludes the specifications about how much compensation must result from commissions, but also those requirements about what the employee earns as a regular rate of pay and the adjective "bona fide" before commissions. N.M. Stat. Ann. § 50-4-21(C)(5).

Working long hours does not necessarily offend even the FLSA's purposes. Cases applying the FLSA, with its narrower exemption, have recognized that the exemption may apply to employees working over forty-hour weeks. See Walton v. United Consumers Club, Inc., 786 F.2d at 312. Such cases have recognized that, while "[n]o factor appears dispositive in the case law [defining commission systems], . . . the first two [-- the connection between a sale and proportional compensation and decoupling hours from pay --] seem to carry the most weight." See Casanova v. Gold's Tex. Holdings Grp., Inc., 2016 WL 1241548, at *8.

The Court will not exclude JWS New Mexico's compensation program from the exemption, because the Plaintiffs work long hours. Such a fact would not offend the FLSA's goals, and nothing suggests that the NMMWA exemption is limited to employees working forty-hour weeks. The Court sees little reason to prevent employers from "com[ing] up with a creative generous way of paying their employees." Tr. at 33:18 (Court). Although the Court recognizes that the Plaintiffs work long hours, any commission, flat rate, or piecework compensation system could result in long hours. JWS New Mexico's compensation system shares the weightier factors characterizing commission systems. It ties compensation, decoupled from time, to a proportion of

sales, incentivizing efficiency in its drivers, and its employees work irregularly throughout the year.  That the Plaintiffs work often does not change the characterization.

Accordingly, the Court concludes that the characteristics of a commission system have been satisfied, and that the Plaintiffs are exempted from the NMMWA under the commission exemption.

## II.     CORMAN AND THE OTHER SIMILARLY SITUATED PLAINTIFFS DID NOT WORK ON A "FLAT RATE" OR "PIECEWORK" BASIS.

Unlike the NMMWA, the FLSA contains no exception for "flat rate" or "piecework" compensation systems.  Compare N.M. Stat. Ann. § 50-4-21(C)(5) with 29 U.S.C. § 207(i).  Other state statutes also contain no similar exemptions.  Guidance from other courts, therefore, does not exist for the "flat rate" or "piecework" exemptions.

### A.      CORMAN AND THE OTHER SIMILARLY SITUATED PLAINTIFFS DID NOT WORK ON A "FLAT RATE SCHEDULE" BASIS.

No case law defines "flat rate schedule" for the NMMWA, and so the Court will start with the term's "plain meaning."  Griego v. Oliver, 2014-NMSC-003, ¶ 21, 316 P.3d at 875.  The New Oxford American Dictionary defines "flat rate" as "a charge that is the same in all cases, not varying in proportion with something."  Flat Rate, New Oxford American Dictionary (2001).  The Cambridge Dictionary defines "flat rate" as "a charge that is the same for everyone;" and as "a rate that is fixed at a particular level that does not change, however much work is done or however much a service is used."       Flat Rate,    Cambridge    Dictionary, https://dictionary.cambridge.org/us/dictionary/english/flat-rate.

The Plaintiffs argue that caselaw should further inform the Court's interpretation of "flat rate schedule."  See Cross Memo. at 10-13.  The Plaintiffs first contend that flat rate schedule

compensation systems exist only in the automobile industry. See Cross Memo. at 10. The Plaintiffs cite Burch v. Foy for this proposition. See Cross Memo. at 10. The Supreme Court of New Mexico in Burch v. Foy noted that "the term 'flat rate schedule' used in the Act has a meaning in the automobile repair field," and admitted that "it is not known whether this is the only field where a flat rate schedule is used." Burch v. Foy, 1957-NMSC-017, ¶ 4, 308 P.2d at 201. The Plaintiffs then cite Klinedinst v. Swift Investments, Inc., Yi v. v. Sterling Collision Centers, Inc., Olivo v. Crawford Chevrolet Inc., and the Wage and Hour Handbook, to argue that Court of Appeals have required flat rate systems to decouple hours from pay.

Neither of the Plaintiffs' arguments convince the Court. The statement in Burch v. Foy does not define "flat rate schedule," as the Plaintiffs contend; rather, it recognizes one context in which the term carries a particular meaning. See Burch v. Foy, 1957-NMSC-017, ¶ 4, 308 P.2d at 201. Klinedinst v. Swift Investments, Inc., Yi v. v. Sterling Collision Centers, Inc., and the Wage and Hour Handbook similarly do not define "flat rate schedule," or establish elements for determining when a compensation program is a flat rate schedule. Rather, they reflect that flat rate schedules can satisfy the requirements for the FLSA's commission exemption. The Seventh and Eleventh Circuits, in Klinedinst v. Swift Investments, Inc. and Yi v. v. Sterling Collision Centers, Inc. concluded that automobile repair shop employees were exempted under the FLSA.[58] Yi v. v. Sterling Collision Ctrs., Inc., 480 F.3d at 510; Klinedinst v. Swift Invs., Inc., 260 F.3d at 1256.

---

[58] Klinedinst v. Swift Investments, Inc., Yi v. v. Sterling Collision Centers, Inc., and the Wage and Hour Handbook reveal that federal courts treat "flat rate schedules" as commission compensation systems. Thus, importing into the NMMWA the definition of "commission" from case law construing the FLSA results in an overlap between the NMMWA exemptions for "commissions" and "flat rate schedules." Under the existing case law, many, or most, "flat rate schedule" systems may, in fact, be "commissions."

Likewise, the Wage and Hour Handbook states "Wage-Hour will not deny that [flat rate] payments represent 'commissions on goods or services . . . ." Wage and Hour Handbook, Section 21h04(d). The Judge Black, in <u>Olivo v. Crawford Chevrolet Inc.</u>, conflated piecework and flat rate schedules, and concluded that automobile repair shop employees were paid on a "piecework" basis when they were "compensated by the job." 799 F. Supp. 2d at 1242. This statement does not define "flat rate schedules;" rather, it suggests that flat rate schedules are decoupled from hours worked.

The Court finds more instructive the context in which the cases that the Plaintiff cites arose. As the Plaintiffs argue and the Supreme Court of New Mexico in <u>Burch v. Foy</u> notes, flat rate compensation programs may exist largely in the automobile industry. <u>See</u> Cross Memo. at 10; <u>Burch v. Foy</u>, 1957-NMSC-017, ¶ 4, 308 P.2d at 201. The commission cases in which flat rate schedules appear arise in the automobile repair shop context. <u>See</u> <u>Yi v. Sterling Collision Ctrs., Inc.</u>, 480 F.3d 505; <u>Klinedinst v. Swift Investments, Inc.</u>, 260 F.3d 1251; <u>Olivo v. Crawford Chevrolet Inc.</u>, 799 F. Supp. 2d 1237. The Wage and Hour Handbook describes flat rate systems:

> Some auto service garages and car dealerships compensate mechanics and painters on the following basis: The painter or mechanic gets so much a "flat rate" hour for the work he or she performs. A "flat rate" hour is not an actual clock hour. The painter or mechanic may work only 7, 8 or 9 hours a day and still receive credit for 10, 11 or 12, etc., flat rate hours depending upon how much work he or she has done. Each job is assigned a certain number of hours for which the customer is charged, regardless of the actual time it takes to perform the job. The employee is given a certain proportion of that charge expressed in terms of so many dollars and cents per "flat rate" hour rather than in terms of a percentage of the charge to the customer. The dealer does not change the employee's share per flat rate hour if the charge to the customer is changed. In such situations Wage-Hour will not deny that such payments represent "commissions on goods or services . . . .

Wage and Hour Handbook, Section 21h04(d). A Google search of "flat rate schedule compensation" reveals websites discussing automobile shops. <u>See</u>, <u>e.g.</u>, <u>Flat-Rate Pay Law and Legal Definition</u>, USLegal, https://definitions.uslegal.com/f/flat-rate-pay/; <u>Which pay plan should</u>

it be − straight time or flat rate?, WardsAuto, https://www.wardsauto.com/news-analysis/which-pay-plan-should-it-be-straight-time-or-flat-rate; Hourly vs. Flat Rate for Auto Techs, Monster, https://www.monster.com/career-advice/article/hourly-vs-flat-rate-for-auto-techs; What Does Flat Rate Pay Mean?, Chron, https://smallbusiness.chron.com/flat-rate-pay-mean-74874.html ("Automotive repair is one field in which flat rate pay is common.").   Alaska and North Dakota have exemptions for flat rate compensation systems, but the statutes exempt only automobile mechanics on flat rate schedules.[59]   Alaska Stat. § 23.10.060(d)(17);[60] N.D. Admin. Code § 46-

---

[59]The term "flat rate" or "flat-rate" is used more commonly in statutes to reference amounts charged customers.   See, e.g., Colo. Rev. Stat. § 42-9-108(5) ("Designation of mechanics, repairers, parts or labor is not required on the customer's invoice if the customer has been given a flat-rate price . . . ."); Me. Stat. 29-A M.R.S. § 1801(2) ("'Flat rate' means a method of calculating charges for labor that is based on the specific repair done and not on the amount of time actually spent on that repair."); Pa 53 P.S.§ 57401 ("All water utilities supplying water to users within the boundaries of any township shall, . . . furnish to the township . . . a list of all water meter readings and flat-rate water bills . . . .").

[60]Alaska's statute exempts:

(17) work performed by a mechanic primarily engaged in the servicing of automobiles, light trucks, and motor homes if the mechanic

(A) is employed as a flat-rate mechanic by a nonmanufacturing establishment primarily engaged in the business of selling or servicing motor vehicles;

(B) has signed a written agreement with the employer that specifies the mechanic's flat hourly rate of pay and the automotive manual or manuals on which the flat rate is to be based;

(C) is compensated for all hours worked in any capacity for that employer up to and including eight hours a day and 40 hours a week at an hourly rate that is not less than the greater of

(i) 75 percent of the flat hourly rate of pay agreed upon by the employer and employee under (B) of this paragraph; or

02-07-02 (providing exemption from overtime laws for "mechanics paid on a commission basis off a flat rate schedule").

Even if flat rate compensation systems exist in other industries, JWS New Mexico's compensation system was not such a program. Such compensation systems are characterized by standardized estimates for jobs. In Yi v. Sterling Collision Ctrs., Inc., 480 F.3d 505; Klinedinst v. Swift Invs., Inc., 260 F.3d 1251; Olivo v. Crawford Chevrolet Inc., 799 F. Supp. 2d 1237, employees received compensation proportional to costs to customers calculated based on standardized, estimated hours for jobs. Reading the dictionary definitions and case law together, "flat rates" are fixed or unvarying, because the same rate applies to the same task, regardless other factors. The ratio of the employee's compensation to the cost charged the customer is not what should not vary; it is the compensation in relation to the amount or quality of work. JWS New Mexico's hourly rate varies in relation to job, according to the hours to complete the job. That the Plaintiffs always received twenty-five percent of the charge is irrelevant. Accordingly, the Court concludes that the Plaintiffs were not compensated under a flat rate schedule.

### B.   CORMAN AND THE OTHER SIMILARLY SITUATED PLAINTIFFS DID NOT WORK ON A "PIECEWORK" BASIS.

JWS New Mexico did not pay the Plaintiffs on a piecework basis. No cases define piecework as the NMMWA uses that word, thus, the Court will begin with "[t]he plain meaning

---

(ii) twice the state minimum wage; and

    (D) is compensated for all hours worked in any capacity for that employer in excess of eight hours a day or 40 hours a week at one and one-half times the rate described in (C) of this paragraph . . .

Alaska Stat. § 23.10.060(d)(17).

of the word[] at issue."[61]  Griego v. Oliver, 2014-NMSC-003, ¶ 12, 316 P.3d at 875.  Sources vary slightly in defining piecework, but the dictionary definitions generally treat piecework as a compensation system focused on payment for production.  While the Defendants dispute that production plays into piecework, dictionary definitions suggest production is relevant.  See Cross MSJ at 10-13; Cross MSJ Reply at 8-9; MSJ at 11-14; Cross MSJ Response at 15-18.  Black's Law Dictionary defines the word as "work done or paid for by the piece or job."  Piecework, Black's Law Dictionary (10th ed. 2014).  Merriam Webster defines it as "work in which you are paid for each thing you make or do and not for the amount of time you work."  Piecework, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/piecework. The Cambridge English Dictionary defines piecework as "work for which the amount of pay depends on the number of items completed rather than the time spent making them."  Piecework, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/piecework.

Cases interpreting the FLSA support linking "piecework" with production as opposed to sales.  In Alvarado v. Corporate Cleaning Services, Inc., Judge Posner, in concluding that window washers paid a percentage of the price charged the customer worked on a commission basis, differentiated between commission and piecework systems:

> Thus the scarf worker is paid for making scarves even if they haven't been sold--that is, even if he's producing for inventory -- while the shoe salesman is paid only when he makes a sale. In the present case, as in the shoe-store example, the window washers are paid only if there's been a sale, namely a sale of window-washing service to a building owner or manager.

---

[61]Olivo v. Crawford Chevrolet Inc. interprets the relevant NMMWA exemption, but the case defines neither "piecework" nor "flat rate," but rather conflates the two terms.  Olivo v. Crawford Chevrolet Inc., 799 F. Supp. 2d at 1242-43.

782 F.3d at 367.  See United States v. Rosenwasser, 323 U.S. 360, 364 (1945)(concluding that garment workers were pieceworkers); Dole v. Snell, 875 F.2d 802, 809 (10th Cir. 1989)(noting that employees paid "by the cake" were paid on a "piecework basis").

> The Third Circuit in Parker discussed opinion letters issued by DOL's Wage and Hour Division and found in them the propositions that flat fees paid for alarm system installations were not commissions but were compensations based on a piecework basis, because they lacked any "connection to the cost to the consumer," but that automobile painters paid per automobile regardless of time taken to complete the job were under a commission system as the painters were "encouraged to work rapidly and efficiently" and received pay that "varied from week to week" and that appeared "to be related to the value of the service performed." *Id.* at 280–81.

Matrai v. DirecTV, LLC, 168 F. Supp. 3d at 1363.

Although, in Olivo v. Crawford Chevrolet Inc., Judge Black described a compensation system in which a body shop compensated employees according to the hours designated for the job, regardless the job's length, as a piecework system, Olivo v. Crawford Chevrolet Inc., 799 F. Supp. 2d at 1237, the statement carries limited persuasive value.  Judge Black reaches this designation without much explanation, noting only:

> A sedulous search by the parties and this Court reveals that no other court has addressed the issue of who is properly considered a flat rate or piecework employee under NMSA § 50-4-21(C)(5).  It does appear that Plaintiffs are compensated by the job, and thus they are paid on a "piecework" basis.

Olivo v. Crawford Chevrolet Inc., 799 F. Supp. 2d at 1242.  Further, in explaining the employees' compensation system, Judge Black describes what other courts, and the Wage and Hour Handbook, characterize as a flat rate system.  See Yi v. v. Sterling Collision Ctrs., Inc., 480 F.3d at 510; Klinedinst v. Swift Invs., Inc., 260 F.3d at 1256; Wage and Hour Handbook, Section 21h04(d).  Accordingly, the Court gives Olivo v. Crawford Chevrolet Inc.'s connection between "piecework" and compensation "by the job" limited weight.

The Court is persuaded that "piecework" involves payment for production, disassociated from sales. The Court agrees with Judge Posner's comments in <u>Alvarado v. Corporate Cleaning Services, Inc.</u>, and everyday parlance associates "piecework" with production in the manner described. Accordingly, the NMMWA exemption applies where employers tie employees' compensation to work done, disconnected from hours worked and sales to consumers.

JWS New Mexico linked the Plaintiffs compensation to the amounts charged the customers. Like the window washers in <u>Alvarado v. Corporate Cleaning Services, Inc.</u>, the Plaintiffs received payment only on a sale's completion. The "piecework" exemption does not, therefore, apply.

## III. THE "YARD TIME" DOES NOT REMOVE THE PLAINTIFFS FROM THE EXEMPTION.

The Court concludes that the "yard time" does not make the Plaintiffs' work non-exempt.[62] The parties do not seriously dispute that the yard time makes the exemption inapplicable. The Plaintiffs cite the yard time for which JWS New Mexico compensated the Plaintiffs hourly as evidence that JWS New Mexico did not wholly compensate the Plaintiffs with exempt pay. <u>See</u> Cross MSJ Reply at 6-7. The hourly compensation for yard time would not satisfy the requirements for a commission system, because the yard time, which JWS New Mexico paid at an hourly rate for time washing or maintaining trucks, was not tied or proportional to a transaction with a customer or decoupled from the hours that the Plaintiffs worked. Similarly, because JWS New Mexico compensated at an hourly rate the Plaintiffs for the yard time, the payments

---

[62]As mentioned infra, "yard time" refers to tasks that the Plaintiffs performed outside a customer job, like washing and maintaining the trucks. MSJ at 4 n.5 (citing Corman Depo. at 38:7-18; <u>id.</u> at 44:8-19; Corman Pay Stub at 1, filed June 17, 2016 (Doc. 39-7)).

constituted neither a flat rate or piecework. Nevertheless, although the Plaintiffs contend that the NMMWA does not exempt employees paid on a partially exempt basis, the Plaintiffs do not seriously argue that the "yard time" alone removes the Plaintiffs from an NMMWA exemption. The Plaintiffs emphasize instead that the NMMWA "does not exempt employees who are paid more than half of their compensation on a non-exempt hourly basis." Cross MSJ at 17.

The yard time compromises a de minimis amount of the Plaintiffs' pay. In 2012, only two percent of Corman's compensation came from yard time. See MSJ at 4 n.5 (citing Corman Depo. at 44:8-19; Corman Pay Stub at 1, filed June 17, 2016 (Doc. 39-7)). The two percent was $1,878.00, as compared to $92,733.92 from driving jobs, which constituted ninety-eight percent of his pay. See MSJ at 4 n.5 (citing Corman Depo. at 44:8-19; Corman Pay Stub at 1, filed June 17, 2016 (Doc. 39-7)).

The NMMWA exemption is silent on how much an employee must receive in commissions to qualify for the exemption. See N.M. Stat. Ann. § 50-4-21 (stating that an employee for the NMMWA's purposes does not include "salespersons or employees compensated upon piecework, flat rate schedules or commission basis"). The language does not inform the reader whether the exemption and/or the word "compensate" are qualified. The Oxford Dictionary Online defines compensate only as to "[p]ay (someone) for work performed." Piecework, Oxford Dictionary Online, https://en.oxforddictionaries.com/definition/compensate. See Griego v. Oliver, 2014-NMSC-003, ¶ 21, 316 P.3d at 875 (directing courts to start with a statute's plain meaning). The NMMWA's language could be read, therefore, to exempt employees making any amount in commissions, to exempt employees making all compensation in commissions, or to exempt

employees making some mix of commissions and other pay.[63]  Based on the NMMWA's silence

on the issue, arguments can be made that the New Mexico Legislature chose either not to limit or

not to broaden the exemption.  See MSJ at 14.

Case law provides limited guidance on this question.  Cases interpreting the FLSA do not

address the issue, because the FLSA requires that an employee make over fifty percent in

commissions to fall within its exemption.  29 U.S.C. § 207 (exempting an employee when "more

than half his compensation for a representative period (not less than one month) represents

commissions on goods or services").  One federal district court in New Mexico has addressed the

provision and determined that it applies to mixed-status employees.   In Olivo v. Crawford

Chevrolet Inc., Judge Black considered whether automobile repair shop employees who received

pre-determined pay for specific jobs but who waited at the automobile repair shop between

assignments, and in the opinion denying summary judgment, Judge Black noted, "there is some

evidence that Plaintiffs are either mixed-status employees or non-piecework employees."  See

Olivo v. Crawford Chevrolet Inc., 799 F. Supp. 2d at 1237.  Judge Black later concluded in its

Final Order, that the NMMWA exemption applied although the employees waited several hours a

week at the repair shop.  See Olivo v. Crawford Chevrolet Inc., CV 10-0872 BB\LFG, Court's

Findings of Fact and Conclusions of Law, ¶ 18, at 11 (dated January 12, 2012), filed June 17, 2016

(Doc. 39-13).  No states have comparable statutes.  See Alaska Stat. § 23.10.055 (exempting

persons employed on a commission basis and whose primary duties are sales); Ca. Code Regs. Tit.

8, §§ 11040, 11070 (exempting employees earning more than half of their compensation in

---

[63]The NMMWA exemption cannot be split to exempt time worked on a commission basis but not exempt time worked on hourly pay, because the overtime calculation includes all time over forty hours a week worked.  See N.M. Stat. Ann. § 50-4-22.

commissions and earning more than one-and-a-half times the minimum wage); Colo. Code Regs. § 1103-1:6 (limiting exemption to employees earning fifty percent per month, and seventy-five percent per year, of their total earnings from commissions); Conn. Gen. Stat. § 31-76i(2) (limiting exemption to salespeople, working fifty-four hours a week or less, and earning more than of their compensation from commissions); 820 Ill. Comp. Stat. 105/4a(F) (basing exemption on FLSA exemption); 26-7-3 Me. Rev. Stat. § 663 (exempting "employees whose earnings are derived in whole or in part from sales commissions'); N.J. Stat. Ann. § 12:56-7.2 (exempting employees who receive at least fifty percent of their compensation from commissions); N.D. Admin. Code § 46-02-07-01 (exempting "[a] straight commission salesperson in retail automobile, trailer, boat, aircraft, truck, or farm implement dealerships unless that salesperson is required to be on the premises for more than forty hours per week."); Wash. Rev. Code § 49-46-130(2)(j)(3)-(4) (exempting employees if commissions constitute more than half of their compensation, and exempting employees selling "automobiles, trucks, recreational vessels, recreational vessel trailers, recreational vehicle trailers, recreational campers, manufactured housing, or farm implements").

Reading New Mexico's statute to exempt any employee receiving commissions from New Mexico's overtime laws, could, as the Plaintiffs aver, lead to exempting employees who earn only small percentages of their overall earnings in commissions. See Cross MSJ Reply at 11. A blanket statement that the NMMWA exempts partial-commission, flat rate, or piecework employees opens opportunities to undermine the NMMWA's aims to maintain minimum wages and overtime compensation. If any employer could gain an exemption by paying a minimal exemption, most employers would likely seek such an advantage.

On the other hand, the FLSA and several states' statutes reflect agreement that asking for pure commission compensation is too demanding; they ask that individuals receive only part, usually fifty percent, of their income from commissions. Such decisions suggest that partial exemptions can satisfy the goals of ensuring reasonable wages and decreasing hours. See 29 U.S.C. § 207(i); Ca. Code Regs. Tit. 8, §§ 11040, 11070; Colo. Code Regs. § 1103-1:6; Conn. Gen. Stat. § 31-76i(2); 820 Ill. Comp. Stat. 105/4a(F); N.J. Stat. Ann. § 12:56-7.2; Wash. Rev. Code § 49-46-130(2)(j)(3)-(4). Even partial commission compensation may accompany irregular hours and encourage efficiency in the workplace. If commissions decouple pay from hours, only the maximum forty-nine percent of an employees' pay may be regular. Similarly, no worker treats fifty-percent of his pay, likely half of his income, as irrelevant, and he will, if he desires, pursue efficiency in seeking his commissions.

Nevertheless, importing such a fifty-percent-of-earnings-or-more requirement into the NMMWA significantly alters the statute. The Court refrains from so changing the New Mexico Legislature's statement. The New Mexico Legislature chose not to include such a qualification when enacting the NMMWA seventeen years after Congress enacted the FLSA, and the Court will not do so now. The New Mexico Legislature instead chose to enact an exemption broader than the FLSA's.

The Court concludes that common sense requires a de minimis exception for the statute, but a de minimis rule is the only rule that the Court will apply to the NMMWA exemption. Pure common sense dictates that the statute should not mean that employees regularly paid on a commission, flat rate, or piecework basis, should be removed from the exemption, because they receive de minimis hourly amounts for tangential tasks. The Plaintiffs are employed and paid for

driving trucks. The yard time is only incidental. In comparison to driving, it is minor time and minor pay for minor tasks. <u>Olivo v. Crawford Chevrolet Inc.</u>'s order supports this conclusion. That the fifty-percent-or-more requirement exists in other states and in the federal statutes strengthens the Court's confidence that recognizing the Plaintiffs as exempt despite the de minimis yard time compensation will not undermine the NMMWA. Common sense is not inconsistent with the statute. Statutory interpretation requires common sense. Reading a blanket fifty-percent-of-earnings-or-more requirement into a statute without that rule is is not common sense. It is rewriting the statute. The "yard time" is a de minimis amount for tasks tangential to the jobs for which JWS New Mexico hired the Plaintiffs.[64] Accordingly, the Court concludes that the Plaintiffs are exempt.

Thus, the Court grants the MSJ and denies the Cross MSJ.

The Court ordered that: (i) Defendants JWS's and KPK's Motion for Partial Summary Judgment, filed June 17, 2016 (Doc. 39), is granted; (ii) the Plaintiff's Cross Motion for Partial Summary Judgment on Defendants' Exemption Defense, filed June 17, 2016 (Doc. 41), is denied; and (iii) the Second Claim of the Collective Action Complaint for Unpaid Overtime Wages, filed October 12, 2015 (Doc. 1), is dismissed with prejudice.

---

[64]The Court also declines to import the FLSA's more-than-fifty-percent requirement for wages earned through commissions into the NMMWA. To do so would be to rewrite the statute in a way that the New Mexico Legislature has not chosen to write its legislation. It could have done so, given that Congress and other legislatures have so chosen. Accordingly, the Court will not come up with a rule that sounds more like statute rewriting than a court decision.

UNITED STATES DISTRICT JUDGE

*Counsel:*

Brandt P. Milstein
Milstein Law Office
Boulder, Colorado

     *Attorney for the Plaintiffs*

Little V. West
Holland & Hart, LLP
Santa Fe, New Mexico

--and--

Jeffrey T. Johnson
Bradford, J. Williamson
Holland & Hart, LLP
Denver, Colorado

     *Attorneys for the Defendants*